589 P.2d 886

**In the Matter of a Member of the State Bar of Arizona Karl Nile STEWART, Respondent.**

No. SB–138.

Supreme Court of Arizona, In Banc.

Jan. 11, 1979.

Lawrence D. Mattice, Phoenix, for petitioner.

Herbert L. Ely, Phoenix, for respondent.

STRUCKMEYER, Vice Chief Justice.

This is an original proceeding for disciplinary action against Attorney Karl N. Stewart. Respondent was charged with two counts of unethical conduct by Local Administrative Committee 5G of the State Bar. Count One of the Formal Complaint was based on a written complaint filed by Leroy Lamb. It charged Respondent with violating DR 2–103 and DR 5–103(B). In Count Two, Respondent was charged with a violation of DR 1–102(A)(4), based on a complaint filed by Tequila Gorden.

The initial hearings on the complaint were held on October 9 and 12, 1976, and the Committee made its Findings and Recommendation on December 28, 1976. The Committee dismissed the charge in Count One, based on DR 2–103, but found that Respondent had violated DR 5–103(B), and recommended censure. On Count Two, the Committee found that Respondent violated DR 1–102(A)(4), and recommended a suspension from the practice of law for 45 days.

After a series of hearings, the Disciplinary Board voted to affirm the Committee's Findings of Fact and the sanction on Count One, but recommended that Respondent be suspended for one year on Count Two. In addition, the Board concluded that, in its opinion, Respondent had also violated DR 9–102(b)(3) under Count Two, but it did not amend the Committee's Findings in regard thereto. When disciplinary action against an attorney is recommended by the Disciplinary Board, it is this Court's duty to determine for itself the facts. *Matter of Dwight*, 117 Ariz. 407, 573 P.2d 481 (1977); *In re Johnson*, 106 Ariz. 73, 471 P.2d 269 (1970). Since each count of the complaint arises out of different facts, they will be discussed separately.

## COUNT ONE

Respondent, in November, 1971, agreed to represent Lamb in connection with a personal injury claim arising out of a broken leg. Lamb was then unemployed. Respondent advanced Lamb $50.00 in cash as a loan to cover living expenses, and in December of 1971, Respondent made Lamb two other advances, totaling $215.00. The Committee and the Disciplinary Board agreed that such conduct violated DR 5–103 of the Code of Professional Responsibility,[1] and recommended that Respondent be censured.

DR 5–103(B) prohibits an attorney from advancing or guaranteeing financial assistance during the representation of his client in connection with contemplated or pending litigation. There are several justifications for this disciplinary rule. First, when a lawyer advances living costs to a disabled client, it is similar to making an advance on account of a prospective verdict.

"It is obvious that, where the advancement of legal expenses is made * * * to enable a disabled client and his family

---

1.  DR 5–103 provides:

    "(A) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:

    (1) Acquire a lien granted by law to secure his fee or expenses.

    (2) Contract with a client for a reasonable contingent fee in a civil case.

    (B) While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that the lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

to survive, any agreement by the disabled client to repay them would not have the effect of providing the attorney with any reasonable source of repayment other than the proceeds received on trial or settlement of his client's claim. In effect, the attorney has purchased an interest in the subject matter of the litigation that he is conducting." *Mahoning County Bar Association v. Ruffalo,* 176 Ohio St. 263, 199 N.E.2d 396, 398, *cert. denied* 379 U.S. 931, 85 S.Ct. 328, 13 L.Ed.2d 342 (1964).

▆ Acquisition by a lawyer of a proprietary interest in a cause of action he is conducting for a client is expressly prohibited by DR 5–103(A), because if an attorney acquires an interest in the outcome of a suit in addition to his fees, it can lead to the attorney placing his own recovery ahead of his client. For example, he might urge a settlement which would be to his best interest but not to the best interest of the client. ABA, Opinions of Professional Ethics, No. 288 (1967); Arizona Ethics Opinion 76–26. Moreover, the practice of making loans to clients, if publicized, would constitute an improper inducement for clients to employ an attorney. ABA Opinion No. 288, *supra.*

Respondent does not deny that he violated DR 5–103 when he lent money to Lamb, but urges that censure is harsh and unwarranted in these circumstances. He claims that the loans were made for purely humanitarian reasons, and that he expected prompt repayment out of Lamb's temporary welfare stipends. Respondent also asserts that he did not make loans to clients as a regular procedure.

▆▆ We agree that these are mitigating factors to be considered when sanctions are imposed. *In re Berlant,* 458 Pa. 439, 328 A.2d 471, 476 n.7 (1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975). Nonetheless, in view of the potential ethical problems inherent in any situation where an attorney advances living expense money to a client and the clear prohibition of such conduct by the Code of Professional Responsibility, the sanction recommended by the Committee and the Discipli-

nary Board is warranted. Respondent is ordered censured for the violation.

## COUNT TWO

The undisputed facts are as follows: On December 31, 1972, the complainant, Tequila Gorden (formerly Dotson), then a fifteen-year-old minor, was injured in an automobile accident. She was a passenger in an automobile driven by Samuel Wesley, brother of Maria Dunbar. At the time of the accident, Tequila Dotson was living in a foster home under the care of Maria Dunbar. At Wesley's suggestion, Dunbar retained Respondent to represent Tequila, and the cause of action was settled for $750.00. On November 23, 1973, Dunbar met with Respondent to discuss the settlement. She then received a check for $175.83 and an itemized statement of costs and expenses. In addition to a debit of $250.00 for attorney's fees, Respondent deducted $49.00 for Dr. Teague, $8.67 for filing and service of process fees, and $266.50 for St. Joseph's Hospital.

▆ At this point, the facts are disputed. Our duty in regard to disputed facts is to make an independent determination of the facts while giving serious consideration to the recommendations of the Disciplinary Board, and the findings and recommendations of the local administrative committee. *Matter of Evans,* 113 Ariz. 458, 556 P.2d 792 (1976); *Matter of Lurie,* 113 Ariz. 95, 546 P.2d 1126 (1976).

"This is especially true when the determination of ultimate facts rests on the weight and credibility of witnesses who have testified in person before that committee. While we cannot avoid the responsibility of determining ultimate facts in disciplinary proceedings, the court is still restricted to the cold record before it and the local administrative committee who heard the witnesses testify and observed their demeanor, as well as the Board of Governors who heard the respondent and were able to question him, are in a superior position to determine the credibility of those witnesses who ap-

peared in person." *Matter of Lurie*, supra, at 95 96, 546 P.2d at 1126 27.

The Committee found these facts:

"4. In fact, no such sum had been paid or was payable to St. Joseph's Hospital, but Tequila Dotson had incurred expenses in the amount of $235.60 at St. Luke's Hospital in Phoenix, for hospital and doctor bills relating to her accident, and this entire amount had been paid by Blue Cross and Blue Shield of Arizona in February and March of 1973.

Respondent knew that these bills from St. Luke's had been paid before November 23, 1973, and still intentionally and wrongfully withheld the sum of $266.50 from the money due to Maria Dunbar and Tequila Dotson at the time of settlement of this claim, even though he knew that no such bill was due. No further attempt was ever made by Respondent to verify or pay out the $266.50 amount Respondent withheld to any person or hospital before the complaint on this matter was received by the State Bar in 1975. Respondent admitted that his trust account records were not itemized sufficiently enough to disclose whether or not the money that he withheld on the Dotson settlement was still present in his trust account at the time of the October, 1976 hearings.

5. Respondent's response to the Committee and testimony at the hearings on this Count of the Formal Complaint are contradictory concerning many material facts, and the Committee finds that Respondent's testimony is not credible in explaining the details of the settlement of Tequila Dotson's claim, and as to the reasons for retaining the money withheld by Respondent from the Dotson settlement check.

6. In his response to the Committee, dated February 26, 1976, the Respondent stated that he had requested copies of the hospital records from St. Luke's Hospital but that they were not sent to him because Mrs. Dunbar was not the guardian. He said that he had submitted a bill given him by Mrs. Dunbar shortly after the accident. He further stated that he had filed a law suit on behalf of Tequila Dotson, and had answered interrogatories in the suit. He further claimed that he was told by Maria Dunbar that the medical expenses had not been paid, and advised her to submit a claim to her insurance carrier, and that the carrier would probably pay 80 percent of the bill. Respondent then claimed that he requested Mrs. Dunbar to contact him as to the unpaid balance, and he would pay St. Luke's Hospital and then send any amounts remaining back to her on behalf of Tequila Dotson. At the time of the settlement, neither Maria Dunbar or Respondent knew where Tequila Dotson was living or how to locate her.

7. Maria Dunbar testified that she had no knowledge at all as to the amount of the Dotson hospital or medical bills. She had no conversation with Respondent as to any amount being still due on any hospital or medical bills, she had none of the bills, and that Respondent never told her to inform him if Blue Cross or Blue Shield had paid any bills. She had informed Respondent that there was Blue Cross and Blue Shield coverage, and understood that all such bills were being sent directly to Respondent. She also testified that her best recollection was that Respondent told her in November, 1973, that he had already paid the hospital bills, although she did not recall exactly whether Respondent said that he had already paid them or that he was going to pay them later.

8. Respondent first testified on October 9, 1976, that he had filed a lawsuit on behalf of the complainant, and the suit was later settled. He testified that he somehow had understood that complainant's hospital bill was issued by St. Joseph's Hospital, and had made a mistake as to the amount, and that this mistake was based upon a figure that his secretary had obtained by telephone. He said that when his secretary telephoned St. Joseph's, she was not able to obtain copies of the bills because the names Dunbar and Dotson were different, and that

there was a problem because Maria Dunbar was not the legal guardian. Respondent later testified that he wasn't sure which hospital the secretary had telephoned, and testified once that he was present with the secretary when she telephoned, after earlier testifying that he was not present. He also later testified that the figure of $266.50 was mentioned in the telephone conversation, but didn't know whether he had obtained a partial or total bill.

9. Actually Tequila Dotson's Blue Cross card was in the possession of Maria Dunbar at the time of the accident. In fact, St. Luke's Hospital would not admit Tequila Dotson to the emergency room on the night of the accident, until Maria Dunbar came to the hospital with the card and signed the hospital registration form. The bills from St. Luke's had Maria Dunbar's name on them as guarantor.

10. Respondent testified on October 9, 1976, in contradiction of his response that Mrs. Dunbar did not know whether the hospital and medical bills were paid or not, and that she had no knowledge of payment. He said that he told her to have the natural mother of Tequila Dotson to request the hospital bills and submit them to the insurance carrier because Mrs. Dunbar couldn't do it because she was not the natural or legal guardian. This conversation is not mentioned in Karl Stewart's response. The testimony in the transcript indicates that Karl Stewart was only aware that Tequila Dotson's natural mother existed sometime after the November, 1973 settlement of the case, when someone called his office and talked to his secretary, but gave no name or address.

11. Respondent further testified that he never took any further action on this matter, and never contacted either hospital again after the settlement. Respondent's file contained copies of three bills from St. Luke's Hospital for Tequila Dotson, concerning the accident. He testified that he must have obtained them after the settlement, but that he didn't know how they got into his file. (State Bar Exhibit Number 13). He further testified that the only evidence of Tequila Dotson's medical expense was contained in Answers to Interrogatories that he filed in her case, and that these Answers were verified by Mrs. Dunbar, who signed them. Respondent admitted that he did not pay Dr. Teague's bill either, because he expected Mrs. Dunbar to submit the bill to the insurance carrier, and then recontact him. He did not know the status of that money in his trust account, and has still not paid complainant the amount he deducted for this bill.

12. On October 12, 1976, after Superior Court files were checked, and after counsel for the insurance company was contacted, it was admitted by Respondent that no suit had ever been filed for Tequila Dotson, and no Answers to Interrogatories in such suit existed. He admitted that he had incorrectly testified as to these matters, and further acknowledged that in September, 1973, he had sent copies of Tequila Dotson's hospital and medical bills from St. Luke's Hospital to the insurance carrier for Gary Banta, the adverse party in the Dotson case (State Bar Exhibit Number 15). He stated that his earlier testimony was mistaken. Respondent therefore had copies of the bills from St. Luke's Hospital in his possession for some time before the case was settled, and these bills had indications on them that they were paid. Respondent then further admitted that his response to the Committee was also incorrect in that he stated that he did not receive hospital records from St. Luke's Hospital because Mrs. Dunbar was not the legal guardian. He admitted that he already had those bills in his possession.

13. After Maria Dunbar received the check for $175.83 from Respondent, she deposited it in a bank, as Tequila Dotson no longer lived with her, and her address was unknown. It was later sent to the Department of Corrections. Tequila Dotson left Maria Dunbar's home in early 1973, and finally obtained the money from the Department of Corrections in July, 1975."

On these facts, the Committee found that "the Respondent falsely represented to his clients in this matter that the sum of $266.50 had been withheld from the settlement money obtained on behalf of Tequila M. Gorden (then Dotson), for payment of hospital bills, when in fact, the money was wrongfully retained by Respondent, as no such debt was due at that time, and Respondent knew that it had been paid." The Committee recommended that Respondent be suspended from the practice of law for a period of 45 days.

This recommendation was based in part upon the prior censure of Respondent. In that incident, Respondent endorsed the name of a third person on the back of a check made payable to the third person and deposited the money in his trust account. The endorsement and deposit were made without authority. The Committee found that the present matter, along with the prior matter which resulted in censure, indicated a similar course of wrongful conduct on the part of Respondent, particularly as to his dealings with clients. Consideration of a prior sanction levied against an attorney is clearly permissible under Rule 38(a)(4),[2] Rules of the Supreme Court, 17A A.R.S., and due process was not violated by the Committee's action.

Respondent attacks the Committee's findings, admitting that he was negligent in his handling of the Dotson matter, but denying that he intentionally misrepresented the amount of funds due Dotson. But we conclude from the evidence that Respondent knowingly misrepresented the amount due to Dotson out of the settlement funds. The clear and convincing quantum of proof required to find Respondent in violation of DR 1–102(A)(4) has been met by the State Bar.

As to the asserted violation of DR 9–102(B)(3), Finding of Fact No. 4 is that the respondent admitted that his trust account records were not itemized sufficiently to disclose whether the money that he withheld in the Dotson settlement was still present in his trust account at the time of the October 1976 hearings. This finding is amply supported in the record and justifies a further censure from this Court.

## DUE PROCESS

In addition to his challenge to the sufficiency of the findings and recommendations of the State Bar, Respondent contends that he was denied due process of law by the local administrative committee and the Disciplinary Board. First, Respondent argues that Count Two of the formal complaint must be dismissed because Tequila (Dotson) Gorden did not have standing to file a complaint against him since he was retained by Maria Dunbar, Tequila's guardian. This argument is utterly untenable. The complainant is not a party to a disciplinary proceeding, Rule 35(a), Rules of the Supreme Court, 17A A.R.S.; rather, the formal complaint in a disciplinary action is filed by the State Bar after it determines, upon its own investigation, that there is probable cause to believe that a member of the bar is guilty of misconduct justifying disciplinary action. Rule 33(b), Rules of the Supreme Court, 17A A.R.S.

Second, Respondent maintains that the Committee's findings and recommendations are void because they were issued more than thirty days after the conclusion of the hearing, contrary to Rule 35(c)(1),[3] Rules of the Supreme Court, 17A A.R.S. Respondent does not argue that he was prejudiced by the delay, nor do we find evidence of prejudice in the record. Under

---

**2.** Rule 38(a)(4) provides:

"A prior disbarment, suspension or censure by this court, or a prior acceptance of censure or suspension by the respondent, may be considered by the committee, the board and this court in recommending or imposing discipline."

**3.** Rule 35(c)(1) provides:

"Within thirty days after the conclusion of the disciplinary hearing the committee shall determine whether or not there is sufficient evidence of misconduct to warrant a recommendation of disciplinary action against respondent."

Rule 38(b),[4] Rules of the Supreme Court, 17A A.R.S., procedural violations of Rule 35(c) are not grounds for invalidation of the Committee's findings and recommendations. Nor do we find that Respondent was denied due process before the Disciplinary Board because the Board released its decision on January 13, 1978, more than thirty days after the December 10, 1977 hearing, in violation of Rule 36(d).[5] The technical procedural violation did not in any way influence the findings of the Disciplinary Board and it does not invalidate the Board's actions. Rule 38(b), supra.

Finally, Respondent claims that under Rule 36(d), supra, if the Board affirms the Committee's findings, it must also affirm the sanction imposed by the Committee, and cannot recommend a greater sanction. Such an interpretation is clearly erroneous. Rule 36(d) provides that the Board shall "recommend" discipline. The word "recommend", as defined in Webster's Third New International Dictionary, means "to indicate as one's choice for something * * *." Respondent's interpretation contradicts the plain meaning of the rule. While the Board may not make a new finding of fact, *Matter of Geyler*, 114 Ariz. 321, 560 P.2d 1228 (1977), it is free to recommend a different sanction than that recommended by the local committee.

It is therefore ordered that Respondent Karl N. Stewart be suspended from the practice of law in Arizona for a period of one year, commencing thirty days after the issuance of the mandate in this case. Respondent is ordered to pay Tequila Gorden the sum of $57.67, the amount of settlement funds still owing,[6] together with interest at 6 percent per annum from the time he improperly withheld her funds. It is ordered that the costs incurred by the State Bar in prosecuting this matter in the amount of $2,126.05 are assessed against Respondent. It is further ordered that Respondent shall comply with the provisions of Rule 37(h), Rules of the Supreme Court, 17A A.R.S.

CAMERON, C. J., and HAYS, HOLOHAN and GORDON, JJ., concurring.

---

4. Rule 38(b) provides, in part:

   "No findings or recommendations made in any proceeding shall be invalidated because of an error * * * in procedure, or upon any other ground, unless upon review it appears from the entire record, including the evidence, that error has been committed which has resulted or will result in a miscarriage of justice."

5. Rule 36(d) provides, in part:

   "Within thirty days after the recommendations of the committee are considered by the board * * *, the board shall make its decision upon the record submitted by the committee, the statement of respondent, if any, and the oral arguments presented to the board, if any. The board shall either dismiss the charges, remand pursuant to Rule 36(c)(1), or recommend discipline."

6. Respondent remitted a $266.50 check to Tequila Gorden when she appeared before the local administrative committee. Respondent admitted that he did not pay Dr. Teague, nor did he file suit in this matter, and those improperly held settlement funds must also be remitted to Tequila Gorden.