602 P.2d 461

**In the Matter of a Member of the State Bar of Arizona James W. CARROLL, Respondent.**

**No. SB–124.**

Supreme Court of Arizona,
In Banc.

Sept. 13, 1979.
Rehearing Denied Nov. 14, 1979.

Richard A. Friedlander, Daniel Cracchiolo, State Bar Counsel, Phoenix, Goldstein, Flynn & Mason, Ltd. by Philip T. Goldstein and Thomas C. Mason, Phoenix, for respondent.

HOLOHAN, Justice.

This is an original proceeding for disciplinary action against James W. Carroll, Jr., a member of the State Bar of Arizona.

An investigation was undertaken by Local Administrative Committee 2B which resulted in the filing of an eight-count complaint against respondent, James W. Carroll, Jr., formally charging him with ethical violations resulting from his conduct toward clients and potential clients in Kingman, Phoenix and Henderson, Nevada, during the period of time immediately after the 1973 Kingman tank car explosion. The complaint charged, *inter alia*, violations with regard to advertising, soliciting, self-recommendation, self-laudation, and the acquiring of a proprietary interest in the claims of certain clients through the advancement to them of monies for cars, trucks, and other expenses. The complaint concluded with a count which charged that the totality of Carroll's conduct was not compatible with a lawyer's obligation to avoid even the appearance of impropriety. Carroll denied all of the allegations.

Extensive formal hearings were held by the Administrative Committee which resulted in its Findings of Fact and Conclusions of Law being issued on May 19, 1977. The committee's recommendation was that Carroll be suspended from the practice of law for a period of one year.

Respondent Carroll filed an opposition to the findings and conclusions of the Administrative Committee, and the matter was heard on review by the Disciplinary Board. The board modified the Administrative Committee's findings and conclusions, but the board approved the recommendation for suspension from the practice of law for a period of one year.

Respondent filed with this court timely objections to the findings and recommendations of the Disciplinary Board. The matter was briefed, argued and submitted for decision.

When disciplinary action against an attorney is recommended by the Disciplinary Board, it is this court's duty to determine for itself the facts. *In the Matter of Stewart,* 121 Ariz. 243, 589 P.2d 886 (1979); *In the Matter of Dwight,* 117 Ariz. 407, 573 P.2d 481 (1977). Most of the ultimate facts are not in serious dispute.

On July 5, 1973, a violent gas explosion occurred in Kingman, Arizona. The explosion took the lives of many people and injured scores of others. The news of the explosion received wide media coverage. On July 11, 1973, a free-lance private investigator, Ronald Augustinovich, left Phoenix for Kingman, Arizona. Augustinovich had, for at least one year prior to July 5, 1973, done occasional investigative work for respondent's law firm, Kleinman, Carroll and Kleinman. Augustinovich stated at the hearing that his main reason for going to Kingman was that he wanted to investigate the explosion privately with the idea of being hired as an investigator either by potential defendants or potential plaintiffs.

*David Vandiver*

Upon arrival in Kingman, Augustinovich went to the scene of the accident, where he came upon David Vandiver, a person who had suffered minor injuries as a result of the explosion. He engaged Vandiver in a conversation concerning the explosion and the facts surrounding it. During the conversation, Vandiver invited Augustinovich to his trailer home where he lived with his mother. In response to a question, Vandiver advised Augustinovich that he had not yet engaged an attorney, but that he did not want to hire a Kingman attorney. Augustinovich recommended to Vandiver that he seek the services of one of three Phoenix lawyers. Respondent was one of those named. Augustinovich urged Vandiver to engage the services of Carroll.

Vandiver, who was nineteen years of age, had never hired a lawyer before this occasion. Augustinovich assisted Vandiver to reach Carroll by telephone in Phoenix. Augustinovich represented to Carroll that Vandiver was Augustinovich's personal friend. Although Vandiver's injuries were minor in scope, Carroll nevertheless responded that he would journey to Kingman that very day to discuss the possibility of representing Vandiver.

Within two or three hours later, Carroll arrived with his partner, Jan Kleinman, in a plane flown by one Michael Sansone, a business partner of the senior partner of the firm of Kleinman, Carroll and Kleinman.

At the Kingman airport, Augustinovich met the Carroll party and drove them to Vandiver's trailer. Thereafter, Carroll and Kleinman engaged in a conversation with Vandiver concerning their representation of him. Vandiver signed a retainer agreement presented by Carroll. In addition to the standard clause regarding client responsibility for costs and expenses, the following language appeared in Carroll's own handwriting:

" . . . The client further agrees to repay to said attorney any and all costs and expenses that may be advanced or paid by said attorney for the client, *only if there is a settlement or judgment obtained. The client will owe nothing if there is no settlement or judgment.*" (Emphasis supplied.)

This was followed by Carroll's signature and dated.

The change of the contingency fee agreement was a departure from the firm's usual contingency fee agreement. The handwritten changes in the Vandiver agreement were used only in fee agreements for clients in the Kingman explosion.

Vandiver mentioned his friend, Steve Mitchell, who was a patient in the Rose De Lima Hospital in Henderson, Nevada. Vandiver telephoned Mitchell to inquire whether Mitchell wanted to retain an attorney before Carroll and Kleinman left the trailer, but he was unsuccessful in reaching him.

The attorneys agreed that they would contact Vandiver the next morning to determine whether Mitchell wanted to retain Carroll.

Carroll, Kleinman and Augustinovich traveled to the site of the explosion where they discussed with Augustinovich the circumstances under which he had met Vandiver. During this conversation, Augustinovich admitted to Carroll and Kleinman that Vandiver was not his friend as he had previously asserted, but that he had come upon him at the accident scene. Carroll and Kleinman discussed the ethical propriety of representing Vandiver under these circumstances and concluded that it was appropriate for them to represent him.

The next day, July 12, 1973, Carroll, Kleinman and Sansone returned to Kingman. Carroll talked to Vandiver by telephone, and Vandiver advised him that Mitchell wanted to retain Carroll's services.

Augustinovich arrived at the airport and drove Carroll, Kleinman and Sansone to the Hertz Rent-A-Car office in Kingman so that they could rent a car to drive to Henderson, Nevada, to see Mitchell. While at the Hertz Rent-A-Car office, the manager asked Carroll and Kleinman whether they were the same law firm which had placed an announcement on Station KAAA offering rides to victims and families of the Kingman disaster to hospitals in Las Vegas, Nevada, and/or Phoenix, Arizona.[1] When Carroll learned of the radio announcement he asked Augustinovich exactly what had occurred. Augustinovich admitted that he had placed the ad on the radio and Carroll, who appeared to be very agitated, demanded that Augustinovich stop further broadcasting of the radio advertisement.

Thereafter, Carroll, Kleinman and Vandiver set out for Henderson, Nevada, to visit Mitchell who had sustained severe burn injuries in the explosion. At the hospital visit Mitchell requested that Carroll contact his wife and his father and mother who lived in Kingman with regard to his decision on whether Carroll should represent him.

---

1. The text of the radio ad as it originally ran was as follows: "One of the investigators in Kingman on behalf of a Phoenix law firm has offered free transportation by air to members of the families of men still in the hospitals in Phoenix and Las Vegas. The plane can carry three passengers plus the pilot. For more information on flying to or from Phoenix or Las Vegas call Mr. Ron Augustinovich at Room 23 in the Kingman Holiday Inn or call the pilot Mike Sansone at 252–8673 in Phoenix." The day after the incident at the rent-a-car office occurred, the phrase "on behalf of a Phoenix law firm" was deleted from the ad.

During the conversation with Mitchell, other victims in the same room apparently engaged in conversation with Carroll with the result that Carroll left personal business cards for them on a table in Mitchell's hospital room. Carroll, Kleinman and Vandiver then left Henderson and drove back to Kingman where Vandiver was returned to his home. Kleinman and Carroll then went to Mitchell's home where they discussed whether Carroll should represent Mitchell with Mitchell's wife and mother. No decision with regard to representation was made at that time.

*Ruth Payne*

On July 13, 1973, Ruth Payne, who had heard the radio advertisement, called Augustinovich at the Kingman Holiday Inn. Payne's son, Kenneth Tooman, had been seriously injured by the Kingman explosion and was hospitalized in Henderson, Nevada. Payne requested that Augustinovich give her a ride to Henderson, Nevada, and Augustinovich agreed he would be willing to drive her there. On the drive to Henderson, Augustinovich repeatedly praised Carroll to Payne. He told Payne that Carroll was an excellent lawyer, and that he had been very successful on behalf of his clients, and had obtained a large settlement for a client. Augustinovich admitted at the hearing that he had the same motivation to obtain Payne for Carroll as he did with Vandiver; that he hoped to be hired as an investigator. On arrival in Henderson, Payne called Carroll at a motel in Las Vegas with a telephone number which had been provided her by Augustinovich.

Payne testified that when she and Carroll met at the Rose De Lima Hospital, she told Carroll that Augustinovich had driven her to Henderson, and that she had obtained Augustinovich's name by calling a telephone number in Kingman. She also told Carroll that Augustinovich had given her Carroll's name. Payne also told Carroll that prior to this meeting she had been in contact with another attorney by the name of Hirsch in Phoenix with regard to representing her. She and Hirsch had reached an oral understanding that Hirsch would represent her, and Hirsch had sent her a retainer agreement for signature. Payne said that she didn't want to sign the retainer agreement. Carroll advised Payne to tell Hirsch that she no longer wanted him to continue on the case, and Carroll asked her to call him if she didn't want him for her attorney. The conversation between Carroll and Payne lasted over an hour and resulted in Payne signing a contingency fee agreement to retain Carroll as her attorney.

The retainer agreement signed by Payne contained the same language which was found in Vandiver's retainer agreement, that no costs would be owed by the client unless a settlement or judgment was received.

Shortly after July 15, 1973, Augustinovich contacted Carroll in Phoenix to determine whether he might do some investigative work on the Vandiver and Payne cases. Carroll thanked Augustinovich for referring both cases to him, but he advised Augustinovich that the firm's staff investigator would be investigating the cases.

Sometime after Payne retained Carroll in July of 1973, she advised him that she needed transportation and that she was financially destitute. Carroll was instrumental in sending her to his partner, Conrad Kleinman, who arranged the purchase of a Chevrolet pickup truck from Dana Brothers, a client of the firm at that time. There was to be no obligation for payment on the vehicle for over one year from the date of acquisition, and the first payment was not to commence until July 31, 1974. In addition, Jan Kleinman advanced a hundred dollars in cash to Payne for expenses.

On August 16, 1973, Payne gave a statement to Steve Fotinos, an investigator, in the presence of Carol DeLong, a police technician for the Kingman Police Department, and Payne's mother, Sergeant Helen Hart, who took down all of Payne's words and transcribed them. Payne stated:

"To begin with, my attorney was going to give me the down payment. Then since he had received so many clients through my efforts, the Hadleys, Rick Kuhl . . . . I worked with Rick Kuhl

at the Fire Center there in Kingman, and I got the Lawrences for him, and he said since you have gotten four or five clients for us, we can afford to get you the pickup, as he put it to me, from all the money he would make from these cases . . . [B]ut he told me not to mention it to anyone because it was not ethical, for me to just keep it to myself, not even to tell my Mom and Dad."

Although Payne stated at the hearing that she may have been mistaken when she gave this statement, there is no evidence in the record to suggest that the statement was either inaccurate, involuntary or untruthful at the time it was given.[2]

Payne also testified that she asked Carroll for some of his business cards so that she could give them to people to whom she was recommending him. Approximately six cards were given to Payne for this purpose.

Carroll received referrals from Payne of six persons, and from Vandiver he received four.

### The Hadleys

One of those whom Payne encouraged to retain Carroll as his attorney was Harry Hadley. A retainer agreement with Carroll was signed by Hadley within minutes after his initial meeting with Carroll. Hadley stated at the hearing that he was so anxious to retain Carroll that he was unwilling even to allow Carroll to explain the terms and conditions of the retainer agreement or to discuss aspects of the case before he had signed up.

The contingent fee agreement signed by Hadley was a printed form which had been modified to contain substantially the same language handwritten in the Vandiver and Payne agreements.[3]

Hadley was also having transportation problems, although he stated that he did not mention this to Carroll. He said that it therefore came as a pleasant surprise to him when, the day after he had signed the retainer agreement, Carroll advanced $400 from Carroll's personal bank account to Hadley and arranged the advance to be used for the purchase of a Mustang vehicle from McCarthy Motors in Kingman. Hadley said that at the time the advance was made, no discussion occurred with regard to the terms and conditions of repayment, and that no discussion was had until Hadley raised the issue with Carroll a few weeks later. The $400 check was made payable to Hadley's son, Patrick Hadley, who also was signed up as a client on July 19, 1973, and the check was given directly to McCarthy Motors.

### The Radio Advertisement

■ Much of the controversy in this case has centered around the radio advertisement and Carroll's relationship to it. The Administrative Committee, on all the evidence, concluded that "the failure of Carroll to take adequate minimal steps to delete the radio announcements constitute[d] a violation of DR 2–101(A), whether directly through the inaction of Carroll or through the conduct of Augustinovich, pursuant to DR 1–102(A)(2)." The Disciplinary Board also found that the conduct violated DR 2–101(B) and DR 2–103(A), (C) and (E).

DR 2–101(B) states in pertinent part:

"*A lawyer shall not publicize himself*, or his partner, or associate, or any other lawyer affiliated with him or his firm, *as a lawyer* through newspaper or magazine advertisements, radio or television announcements, . . . *nor shall he authorize or permit others to do so in his behalf.*" (Emphasis supplied.)

2. We agree with the Disciplinary Committee that on these facts, Carroll's ample opportunity to discuss this statement with Payne between the time she gave it and the time of the hearings, coupled with the knowledge that he was instrumental in obtaining a large settlement for her son, might give Payne cause to believe that her original damaging statement needed to be corrected.

3. The language in question was:
"The Client further agrees to repay to said attorney any and all such costs and expenses that may be advanced or paid by said attorney for the Client but only if there is money obtained through a settlement or Judgment. If no money is obtained there will be nothing owing by the client."

At the times when these events occurred it was a violation of professional ethics for an attorney to advertise or authorize or permit others to do so for him. This position was found to be in violation of the Constitution in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). The United States Supreme Court ruled in *Bates* that truthful restrained advertising of the availability and terms of routine legal services was protected commercial information safeguarded by the first and fourteenth amendments.

There may be serious question whether the conduct involved in this radio broadcast meets the test set forth in *Bates*, but there was no specific outline of what was approved or proscribed after the rule was struck down. We are therefore unwilling to find a violation of the code of ethics from the activities connected with the radio broadcast.

*Solicitation of Business*

■ Respondent Carroll challenged the constitutionality of the disciplinary rules prohibiting the solicitation of legal business. At the time of the challenge the United States Supreme Court had not ruled on the issue. Subsequent to oral argument that court in *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), ruled that in-person solicitation of professional employment by a lawyer does not stand on a par with truthful advertising about the availability and terms of routine legal services. The Court held specifically that Disciplinary Rule 2–103(A) did not offend the Constitution.

The Federal Supreme Court in *Ohralik* recognized the strong interest which a state has in adopting and enforcing rules of conduct designed to protect the public from situations which are inherently conducive to overreaching and other forms of misconduct such as harmful solicitation by lawyers whom it has licensed.

There is no doubt from the record that respondent violated the Disciplinary Rules DR 2–103(A) and (E). The use and ratification of the conduct of Augustinovich and Payne was solicitation of professional employment. The fact that the activities were carried on by others does not relieve respondent Carroll of responsibility, for a lawyer may not circumvent a disciplinary rule through actions of another. DR 1–102(A)(2). The conclusions of the Disciplinary Board on this subject (Conclusions of Law 2 and 3) are approved.

*Violation of DR 5–103(B)*

■ The contingency fee agreement utilized by Carroll in connection with the Kingman cases was a clear and gross violation of DR 5–103(B). The cited disciplinary rule prohibits an attorney from advancing the expense of litigation unless the client remains ultimately liable for such expenses. The agreements in question specifically relieve the client of any obligation to repay the attorney for costs and expenses advanced unless money was obtained through settlement or judgment.

We condemned this practice most recently in *In re Stewart*, 121 Ariz. 243, 589 P.2d 886 (1979). The actions of an attorney in advancing legal expense which can only be recovered from settlement or judgment result in the attorney buying an interest in the litigation. This presents the problem of an attorney possibly acting against his client's best interest to recover his advances rather than being concerned solely with the best interest of his client.

*Advances to Clients*

■ The record amply supports the conclusion that cash payments were made to Payne and Hadley. These payments were clear violations of DR 5–103(A) and (B) which prohibit such advances.

Respondent does not deny that he violated this disciplinary rule, but urges us to accept his position that he made these loans purely for humanitarian purposes. We agree that this is a mitigating factor to be considered. *In re Stewart, supra; In re Berlant*, 458 Pa. 439, 328 A.2d 471; 476 n. 7 (1974), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975). Nevertheless, in view of the potential ethical problems inherent in any situation where an attorney advances living expense money to a client

and the clear prohibition of such conduct by the Code of Professional Responsibility, we think that the committee's conclusion that an ethical violation occurred was correct.

We are compelled to point out that the practice of making advances to clients, if publicized, would constitute an improper inducement for clients to employ an attorney. We think that this rationale applies as well to retainer agreements such as those utilized in this case, because such agreements generally are interpreted by lay people to mean that there will be no obligation for costs of the lawsuit at any time unless the lawsuit is successful. It is obvious that as between a lawyer who offers such an agreement and a lawyer who does not, the client will choose the lawyer who offers the lesser financial obligation, regardless of the skill of the lawyers involved, and regardless of the other factors to be considered in the employment of legal counsel.

*Disciplinary Action*

■ Respondent contends that the recommended discipline of a one-year suspension from practice is too severe. He points out that there was no dishonesty involved in his actions and no harm resulted to any client.

While respondent is correct in stating that no dishonesty or harm resulted, nevertheless the conduct in question was blatant and gross in its violation of the rules for the profession. As was pointed out in *In re Stout*, 122 Ariz. 503, 596 P.2d 29 (1979) (SB–159), that in addition to the protection of the public, discipline is imposed to deter other lawyers from the temptation to violate their ethics. We believe that the recommended period of suspension is appropriate after considering all the circumstances.

It is therefore ordered that respondent James W. Carroll, Jr., be suspended from the practice of law in this state for one year commencing upon the issuance of the mandate. It is further ordered pursuant to Rule 37(g) Rules of the Supreme Court that respondent pay costs in the sum of $10,-802.46.

STRUCKMEYER, V. C. J., and HAYS, J., concur.

NOTE: Justice FRANK X. GORDON, Jr., did not participate in the determination of this matter.

CAMERON, Chief Justice, specially concurring

I concur in the above opinion which holds that the respondent be suspended from the practice of the law for a period of one year.

I feel that I must specially concur, however, because of the time which it has taken to dispose of this matter. I do so not to embarrass the State Bar of Arizona or this court. I do so because I believe that to acquiesce silently in the unnecessary delay, is, in the long run, more embarrassing. In this position I am not without precedent. See concurring opinion in *State v. Classen*, 285 Or. 221, 590 P.2d 1198 (1979).

Although the acts out of which this complaint arose occurred in July of 1973, the matter of respondent's conduct was first brought to the attention of the State Bar of Arizona in January of 1974, over five and one-half years ago. After an investigation lasting over two years, the local administrative committee, on 7 May 1976, issued a formal complaint against the respondent. Formal hearings on the complaint did not commence until 9 February 1977 and ended on 29 March 1977. After objections by the respondent, the matter was heard by the state bar disciplinary board on 30 July 1977. Respondent was notified by letter on 24 August 1977 of the decision of the state bar disciplinary board in upholding the findings of the administrative committee. Respondent objected and the matter was filed with this court on 6 September 1977. Respondent's briefs were filed by respondent on 7 November 1977, the bar counsel's responding brief was filed on 9 January 1978, and the respondent's reply brief was filed on 28 February 1978. The matter was heard by this court in oral argument on 13 April 1978.

In all it took over four years—from January 1974 until February 1978—for the matter to be at issue before this court, the greatest period of time being the over two

years it took to investigate the matter. This is too long.

This is not the first time that we have commented on the delay in investigating and deciding bar disciplinary matters:

" * * * we want it known that we disapprove of long delays such as occurred here, in bringing to a conclusion charges against a member of the bar for professional misconduct. It is most unfair to the accused as well as bringing our disciplinary procedure into disrepute." In Re Everett, 80 Ariz. 124, 128, 293 P.2d 928, 931 (1956). See also In Re Moeur, 82 Ariz. 185, 310 P.2d 508 (1957).

Although the time it took to investigate and determine the matter is to be deplored, it should also be remembered that lawyers in this state serve as members of the bar administrative committees, the bar disciplinary board, and in other capacities free of charge. These attorneys donate their time unselfishly to the betterment of their profession. In the instant case, the facts were admittedly more complicated than usual, and the delay by the bar may be understandable. I would hope, however, that in the future greater efforts will be taken by the bar to speed up the disciplinary process.

If the delay in the investigation of this matter by the state bar is in part understandable, the delay which occurred in this court is not. The basic internal operating procedures of this court are not mysterious nor should they be. See "Internal Operating Procedures of the Arizona Supreme Court," 17 Ariz.L.R. 643 (1976). This matter was argued orally to us on 13 April 1978. On the same day, after oral argument, the matter was assigned to the author of this opinion for writing. It was not until 5 September 1979, over seventeen months later, that a proposed opinion was circulated to the other members of this court for approval.

The "Standards Relating to Appellate Courts" of the American Bar Association's Commission on Standards of Judicial Administration provide in Standard 3.52:

"(4) Decision. For a court sitting in panels of three judges, the average time for rendering decision should not exceed 30 days; the maximum time for any case, except one of extraordinary complexity, should not exceed 60 days. For a court sitting in larger panels, the average time should not exceed 60 days; the maximum time, except in cases of extraordinary complexity, should not exceed 90 days."

Even assuming for a moment that the fact situation here is one of extraordinary complexity, seventeen months is too long a time for this court to take in disposing of the matter. Admittedly, as judges, we are required to decide the dull as well as the interesting cases—the case of no concern to any but the litigants and their attorneys as well as the case that is of keen interest to the public. There are some cases, however, in which it is just as important that the matter be disposed of quickly as it is that it be decided correctly. Bar discipline cases are frequently such cases.

The purpose of bar discipline is not to punish the attorney, but to protect the public. Matter of Lurie, 113 Ariz. 95, 546 P.2d 1126 (1976); In Re Moore, 110 Ariz. 312, 518 P.2d 562 (1974). If an attorney is guilty of misconduct for which he must be disciplined, the public is entitled to that determination as soon as possible. Not only is confidence in the legal profession eroded by unnecessary delay in the determination of disciplinary matters, but the attorney is left to "turn slowly in the wind" while the matter is being determined. If an attorney is not guilty of misconduct, he certainly is entitled to have this questioning of his professional conduct quickly erased.

The delay in the instant case is made all the more regrettable by events which occurred after the conduct disapproved of in the above opinion. In July of this year, approximately six weeks before the opinion was circulated to the other members of this court, it was announced that the lawsuit out of which respondent's questionable conduct arose had been tentatively settled. During all this time the respondent has been a member in good standing of the State Bar of Arizona and as such was entitled to and did actively participate in that

settlement. He stands now to reap a handsome reward for his misconduct, due, in no small measure, to the failure of this court to reach a decision within a reasonable period of time.