# In re Frank Berk

[602 A.2d 946]

No. 90-542

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed December 6, 1991

*Wendy S. Collins*, Bar Counsel, Montpelier, for Plaintiff-Appellee.

*P. Scott McGee* of *Hershenson, Carter, Scott & McGee*, Norwich, for Defendant-Appellant.

**Per Curiam.** Attorney Frank Berk appeals from a Professional Conduct Board ("PCB") conclusion that he violated two provisions of the Code of Professional Responsibility, DR 1-102(A)(3) (engaging in conduct involving moral turpitude) and DR 1-102(A)(7) (engaging in conduct that adversely reflects on fitness to practice law) and from the board's recommendation that he be suspended from the practice of law for six months. We affirm the board's conclusions and accept its recommendation on sanctions.

At the time of the relevant events, appellant had been an attorney in this state for thirteen years and was a senior partner in a law firm. In May 1988, he was arrested in New Jersey in the process of purchasing between six and seven grams of cocaine, which he intended to share with an associate in his law firm. He was charged with attempted possession of cocaine but, after he successfully completed a pretrial diversion program, the charges were dismissed.

This incident triggered the filing of the PCB complaint. The subsequent investigation revealed that appellant had completed at least three similar drug purchases in the prior seven months. Each purchase was made from the same friend who lived in New Jersey. The locations of the drug purchases varied: sometimes the friend travelled to Vermont, sometimes appellant travelled to New Jersey. On each occasion, appellant collected money from other friends to buy the drugs and after the purchase shared the drugs with them. In the course of the May 1988 drug transaction, appellant met with his cocaine supplier, who had been arrested on drug charges and who sought his

legal advice. Appellant told the dealer that he could not represent him because he was not licensed to practice law in New Jersey, but he discussed his case in general terms.

Appellant does not contest the board's findings. Rather, he argues that the facts do not support the board's conclusions that he engaged in conduct involving moral turpitude and adversely affecting his fitness to practice law.

The parties raise two preliminary issues: (1) what standard of review applies to PCB conclusions and dispositions, and (2) whether the PCB's conclusions concerning professional misconduct are limited in scope by the formal charge against him.

## I. Standard of Review

PCB decisions are appealable to this Court under Rule 8(E) of the Permanent Rules Governing Establishment of Professional Conduct Board and Its Operation ("Permanent Rules"), A.O. 9. The same rule provides that the board's findings of fact "shall not be set aside unless clearly erroneous." *Id.* The rules do not, however, provide standards of review for the board's conclusions (mixed findings of fact and law) or its recommendations on sanctions.

Prior to the adoption of the rewritten Administrative Order 9 (effective July 1, 1989), the PCB's findings, whether purely factual or mixed legal and factual, were upheld if they were "'clearly and reasonably supported by the evidence.'" *In re Rosenfeld,* 157 Vt. 537, 543, 601 A.2d 972, 975 (1991) (quoting *In re Wright,* 131 Vt. 473, 490, 310 A.2d 1, 10 (1973)). Nothing in the current version of this order suggests that this standard no longer applies.

■■ The PCB acts on behalf of this Court and pursuant to rules adopted by this Court. See Preamble to Permanent Rules, A.O. 9 (PCB created by this Court pursuant to its "exclusive responsibility . . . for the structure and administration of the lawyer discipline and disability system"). This Court retains "inherent power . . . to dispose of individual cases of lawyer discipline." *Id.*; see also Vt. Const. ch. II, § 30 (Supreme Court has "disciplinary authority concerning all . . . attorneys at law in the State"). Consequently, this Court does not "review" PCB recommendations on sanctions; rather, it makes its own ulti-

mate decisions on discipline. Nonetheless, PCB recommendations on sanctions will be accorded deference. See *In re Harrington*, 134 Vt. 549, 552, 367 A.2d 161, 163 (1976) (because PCB acts "both as an arm of the Court and as a body representative of the profession," its recommendations "carry great weight"). Courts in other jurisdictions are similarly deferential. See, e.g., *In re Kushner*, 101 N.J. 397, 403, 502 A.2d 32, 35 (1986); *In re Gubbins*, 380 N.W.2d 810, 812 (Minn. 1986); *Hawkins v. State Bar*, 23 Cal. 3d 622, 627, 591 P.2d 524, 526, 153 Cal. Rptr. 234, 236 (1979).

## II. Complaint

Appellant argues that conclusions of misconduct cannot be based on uncharged behavior. He asserts, therefore, that only those findings relating to the events of May 1988, culminating in his arrest for attempting to purchase cocaine in New Jersey, can be used to support misconduct.

■■ A PCB proceeding is neither civil or criminal; rather, it is sui generis. A.O. 9, Permanent Rules, Rule 13(A). Nevertheless, regardless of the form of the proceedings, an attorney charged with misconduct is entitled to basic procedural due process rights, including the right to fair notice of charges. *In re Ruffalo*, 390 U.S. 544, 550 (1968). Thus, findings concerning uncharged behavior cannot be used to support a conclusion of misconduct. See *In re Roberts*, 442 N.E.2d 986, 988 (Ind. 1983) (attorney charged with misconduct "is entitled to know in advance the extent of the charges against him"). When determining sanctions, however, the Court may consider not only the misconduct, but also "the entire course of [the attorney's] conduct . . . , including any uncharged misconduct which is supported by the evidence in the record and relates to the finding of misconduct." *Id.*

## III. Moral Turpitude

■ Appellant asserts that, under Vermont law, his behavior does not rise to the level of moral turpitude. Not every criminal act involves moral turpitude; only those which are by nature "base or depraved" qualify. *State v. Fournier*, 123 Vt. 439, 440, 193 A.2d 924, 925 (1963). The term is "amorphous at best," and

no clear guidelines exist for determining when it applies. *State v. LaPlante*, 141 Vt. 405, 409, 449 A.2d 955, 957 (1982). Nevertheless, one relevant factor is society's view of the activity, that is, whether "sufficient opprobrium [has] attach[ed] to the crime." *Fournier*, 123 Vt. at 440, 193 A.2d at 925.

█ Contrary to appellant's assertions, we did not decide in *LaPlante* that, as a matter of law, possession of a controlled substance is never a crime of moral turpitude. We decided only that possession of an unspecified quantity of an unspecified "harmful" drug was not a crime of moral turpitude for the purpose of impeaching a witness's credibility. The Court reasoned that, because the drug in another context would have "redeeming social value," possessing it is not "inherently evil." *LaPlante*, 141 Vt. at 410, 449 A.2d at 957. We doubt that cocaine has redeeming social value. See *In re Chase*, 299 Or. 391, 404–05, 702 P.2d 1082, 1090–91 (1985) (Peterson, C.J., dissenting) (describing the debilitating physical effects of cocaine and the magnitude of the social problems its use has caused). Rather, we conclude that sufficient opprobrium has attached to its possession to support a finding of moral turpitude.

█ Moreover, more than simple possession is at issue here. Appellant initiated an illegal drug transaction, conspiring with his friend and a dealer in New Jersey to purchase the drug. He involved his associate in the deal, collecting money from him for the drug and intending to share it with him. Appellant went to New Jersey, met with the drug source to discuss his legal problems, and was prevented from completing the transaction only by the intervention of the police. These factors—soliciting and conspiring to purchase, possess, and distribute cocaine—make the transaction more than simple possession of a drug for personal use and are sufficient to characterize appellant's activity as involving moral turpitude.

Cases from other jurisdictions overwhelmingly support the view that virtually any drug-related activities involve moral turpitude. See Annotation, *Narcotics Conviction as Crime of Moral Turpitude Justifying Disbarment or Other Disciplinary Action Against Attorney*, 99 A.L.R.3d 288 (1980). In many of these cases, drug quantities are very small and profit is not a motive. See, e.g., *Committee on Professional Ethics v. Green*,

285 N.W.2d 17, 18 (Iowa 1979) (delivery of cocaine); *State ex rel. Nebraska State Bar Ass'n v. Matt*, 213 Neb. 123, 126, 327 N.W.2d 622, 623–24 (1982) (helping a friend buy cocaine constitutes "aiding and abetting in criminal dealings"); *In re Gorman*, 269 Ind. 236, 237, 379 N.E.2d 970, 971–72 (1978) (possession with intent to distribute, distribution and conspiring to distribute one gram of cocaine); *Florida Bar v. Weintraub*, 528 So. 2d 367, 368 (Fla. 1988) (possessing cocaine and delivering it to a friend); *Office of Disciplinary Counsel v. Simon*, 510 Pa. 312, 314, 507 A.2d 1215, 1216 (1986) (facilitating a sale of four ounces of cocaine).

Two cases cited by appellant—*In re Smoot*, 243 Kan. 589, 757 P.2d 327 (1988), and *In re Chase*, 299 Or. 391, 702 P.2d 1082 (1985)—are factually distinguishable. Both are simple possession cases. In neither case was there any evidence that an attorney had conspired with others to purchase drugs or had distributed drugs to others. In *Smoot*, an attorney was found to have possessed a gram of cocaine solely for personal use. 243 Kan. at 590, 757 P.2d at 328. The attorney was sanctioned, but not for moral turpitude. *Id. Chase* involved attempted possession of a small amount of cocaine, a misdemeanor. 299 Or. at 393, 702 P.2d at 1083. Overruling a disciplinary board vote, four to three in favor of finding that such conduct involved moral turpitude, a divided court distinguished between possession for personal use and trafficking or sale. *Id.* at 403, 702 P.2d at 1090.

■■ That appellant was prevented from completing the transaction is irrelevant. With respect to moral turpitude, there is no distinction "between the commission of a substantive crime and an attempt to commit it." *Id.* at 402, 702 P.2d at 1089.

## IV. Fitness

Appellant argues that his actions in attempting to purchase and distribute cocaine did not directly implicate his professional conduct or adversely affect his capacity to practice law. We disagree.

■ An attorney is subject to misconduct even for actions committed outside the professional capacity. *Committee on Professional Ethics v. Shuminsky*, 359 N.W.2d 442, 445 (Iowa 1984) ("lawyers do not shed their professional responsibility in

their personal lives"); see also *Disciplinary Board of Hawaii v. Bergan*, 60 Haw. 546, 554, 592 P.2d 814, 818 (1979).

The Alaska Supreme Court rejected a similar argument in *In re Preston*, 616 P.2d 1, 5 (Alaska 1980):

> An attorney acts in a position of public trust and is an officer of the court. He has a duty to the profession and the administration of justice, especially to uphold the laws of the state in which he practices.

See also *In re McLaughlin*, 105 N.J. 457, 462, 522 A.2d 999, 1002 (1987) (possession of drugs for personal use reflected adversely on attorney's fitness to practice law); *Simon*, 510 Pa. at 321, 507 A.2d at 1220 (attorney's involvement in drug transaction reflected on his ability to practice law because he "knowingly and intentionally shirked his responsibility as an officer of the court and exemplified disrespect for the laws which govern our society"); *Gorman*, 269 Ind. at 239, 379 N.E.2d at 972 (attorney's drug conviction implicated his fitness to practice law because he "has attempted to place himself above the law and superior to societal judgments").

 Appellant knew his behavior was illegal. He had been an attorney for thirteen years and even discussed criminal charges with the New Jersey drug dealer. His actions reflect negatively on his professional judgment and detract from public confidence in the legal profession.

Also relevant is Ethical Consideration 1-5 of the Code of Professional Responsibility:

> A lawyer should maintain high standards of professional conduct and should encourage fellow lawyers to do likewise. . . . Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.

In this regard, appellant's behavior is even more reprehensible because he encouraged and facilitated his associate's participation in a criminal act.

### V. Administration of Justice

 Bar counsel asserts that the PCB erred in dismissing a third charge against appellant, violation of Code of Professional

Conduct, DR 1-102(A)(5) (engaging in conduct prejudicial to the administration of justice). Upon failure to file an appeal, "dismissal [of a charge] shall become effective." A.O. 9, Permanent Rules, Rule 8(E). Bar counsel did not appeal the dismissal and consequently cannot raise the issue now.

## VI. Sanctions

Appellant argues that the sanction recommended by the PCB is too severe in light of the facts of the case, mitigating circumstances, and lack of any injury to clients. We disagree.

The purpose of sanctions is not punishment. Rather, they are intended to protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar. *In re Calhoun*, 127 Vt. 220, 222, 245 A.2d 560, 561 (1968). Sanctions also serve the goal of deterring others from similar conduct. *Shuminsky*, 359 N.W.2d at 444–45; *Florida Bar v. Lord*, 433 So. 2d 983, 986 (Fla. 1983); *In re Carroll*, 124 Ariz. 80, 86, 602 P.2d 461, 467 (1979).

The PCB evaluated sanctions under the American Bar Association Standards for Imposing Lawyer Sanctions. We have found these standards helpful and have used them in arriving at attorney sanctions. *In re Rosenfeld*, 157 Vt. at 546–47, 601 A.2d at 977–78. Under Standard 3.0, factors relevant to deciding sanctions include: (a) the duty involved; (b) the lawyer's mental state; (c) the actual or potential injury; and (d) any aggravating or mitigating factors.

Using this scheme, the PCB analyzed appellant's actions under Standard 5.0 as a violation of a duty owed to the public. See Introduction to Standard 5.0 ("The public expects the lawyer to be honest and to abide by the law; public confidence in the integrity of officers of the court is undermined when lawyers engage in illegal conduct."). The board then looked at sanctions recommended for this violation. Under Standard 5.11, disbarment is an appropriate sanction when a lawyer engages in "serious criminal conduct, a necessary element of which includes . . . the sale, distribution or importation of controlled substances." The PCB rejected disbarment because it found no "evidence to indicate that [appellant] was engaged in commercial drug trafficking." Instead, it recommended suspension, the

appropriate sanction "when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice." Standard 5.12. Possession of narcotics is one of the crimes most commonly warranting suspension under this standard. Commentary to Standard 5.12.

Having determined that suspension was the appropriate sanction, the PCB looked at mitigating factors, including character evidence in the form of numerous supporting letters, see Standards 9.3, 9.32(g), and recommended a six-month suspension, the shortest time provided by the standards. See Standard 2.3 and Commentary (suspension should be no less than six months, no more than three years; at least six months necessary to protect public and adequately show rehabilitation).

In light of all the circumstances—including the seriousness of the attempted crime, appellant's involvement of his associate in criminal activities, the pattern of behavior, the need to deter others from similar behavior and restore public confidence in the legal profession, and the extensive support from appellant's peers and acquaintances attesting to his good character and professional competence—we find that the board's recommendation of six months suspension is appropriate.

The provisions of Administrative Order 9, as amended effective July 1, 1989, apply in this case. At the end of six months, appellant will not be automatically reinstated; rather he must comply with Rule 20(B) and (D). Specifically, he must show as a condition of reinstatement that he has "the moral qualifications . . . for admission to practice law in the state, and the resumption of the practice of law will be neither detrimental to the integrity and standing of the bar or to the administration of justice nor subversive of the public interest and that [he] has been rehabilitated."

*Judgment that Frank Berk is suspended from the office of attorney and counselor at law for a period of six months, beginning January 6, 1992 and ending July 6, 1992, and thereafter until he demonstrates compliance with reinstatement conditions contained in this opinion.*

**Morse, J.**, concurring. Because I believe that "moral turpitude" is so vague that it invites arbitrary interpretation and

application and inadequately warns what crimes are sanctionable as professional misconduct, I do not join section III of the Court's opinion. I concur with the remainder of the opinion.

The term is rooted in common law and was developed at a time when concepts of religion and law were more closely interwoven and sin and crime were virtually synonymous. *Jordan v. De George*, 341 U.S. 223, 237 (1951) (Jackson, J., dissenting). Consequently, the term "assumes the presence of [a] common conscience . . . of the community," Bradway, *Moral Turpitude as the Criterion of Offenses that Justify Disbarment*, 24 Calif. L. Rev. 9, 21 (1935), based on fixed legal and moral concepts. But, as society has increasingly become both more secular and pluralistic, there is less consensus about what is immoral, especially in areas of "vice"—sexual relations, gambling, and drug and alcohol use. Without social consensus on what is "moral," the term conveys little guidance to fathom what we mean by it.

Today, moral turpitude is a compass with the directional needle removed. We are left only the temptation to label behavior we find personally repugnant "immoral," or, as in this case, simply to follow without analysis the popularly held opinion vilifying drug use. See *id.* (judge "may unconsciously mistake his own bias for an intuitive perception of the common conscience"). The resulting decisions on moral turpitude are unprincipled and contradictory, and exacerbate rather than cure the vagueness of the term. See *Jordan*, 341 U.S. at 239 (examining fifty lower court opinions applying "moral turpitude" and finding the "chief impression from the cases is the caprice of the judgments"; "[i]rrationality is inherent in the task of translating the religious and ethical connotations of the phrase into legal decisions"). Crimes involving moral turpitude might as well be all serious crimes committed by a lawyer.

Recognizing problems in defining moral turpitude, we have already eliminated its primary use as the gauge for determining which crimes may be used to attack a witness's credibility. See Reporter's Notes to the 1989 Amendment to V.R.E. 609(a) (labeling "moral turpitude" as "troublesome" and "vague" and replacing it with "more precise and relevant standards for determining the admissibility of prior convictions for impeachment"); see also Reporter's Notes to now superseded V.R.E. 609(a) (questioning the utility of categorizing crimes as mala in

se and mala prohibita and describing the apparently inconsistent case law on Rule 609 moral turpitude). In our pre-1989 cases, we attempted to mitigate the vagueness problem by tying moral turpitude to "testimonial reliability—whether the convicted person would regard lightly the obligation to tell the truth." *Id.*

DR 1-102(A)(3) provides no such functional saving grace. Appellant should not be sanctioned for departing from such an arcane and ill-defined standard, although his conduct is sanctionable as conduct adversely reflecting on his fitness to practice law and should be treated as such. See ABA Model Rule of Professional Conduct 8.4(b) (eliminating moral turpitude standard and defining misconduct as "a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects") and ABA Annotated Model Rules of Professional Conduct 353–54 (1984) (moral turpitude standard was rejected because it had proved "manifestly ambiguous [as] evidenced by the wide ranging interpretations given it by the courts" and had been criticized by commentators "as inviting subjective judgments of diverse lifestyles instead of focusing on the lawyer's ability and fitness to practice law").

Criminal conduct "adversely reflecting on fitness to practice law" is also vague, but the phrase invites less value-laden interpretation. I appreciate the gravity of a lawyer's conduct when he travels out-of-state, where he is less likely to be recognized, to purchase cocaine to satisfy his and a colleague's appetite. A lawyer—sworn to uphold the law and expected to be a good example to society—who does such a thing demeans the practice of law and causes others to disrespect the law. On the other hand, I have difficulty contemplating that the act of purchasing drugs for a lawyer's use is so depraved that it rises to the level of moral turpitude.

**Johnson, J.**, concurring. I do not agree that appellant's actions involved moral turpitude and therefore do not join section III of the Court's opinion.

Our case law defines a crime of moral turpitude as "one based on conduct not only socially undesirable, but, by its very nature, base or depraved." *State v. LaPlante*, 141 Vt. 405, 408, 449 A.2d 955, 956 (1982); *State v. Fournier*, 123 Vt. 439, 440, 193 A.2d

924, 925 (1963). This definition originated in the traditional distinction between crimes mala in se and those mala prohibita. *Id.* See 1 W. LaFave & A. Scott, Substantive Criminal Law § 1.6(b), at 45 (1986) (crimes mala in se are "wrong in themselves; inherently evil"; those mala prohibita are "not inherently evil; wrong only because prohibited by legislation"). Crimes of moral turpitude are mala in se, that is, acts that, even without the added stigma of being criminalized, are, in themselves, morally repugnant. See Black's Law Dictionary 865 (5th ed. 1979) (crime malum in se is "immoral in its nature and injurious in its consequences, without any regard to the fact of its being noticed or punished by the law of the state").

Although courts have had difficulty classifying which crimes involve moral turpitude or are "bad in themselves," crimes so classified are generally characterized by an attempt to achieve personal gain or satisfaction by exploiting or injuring others. See LaFave & Scott, *supra*, at 45–48. Thus, murder, Black's at 865, and crimes "dangerous to life or limb," LaFave & Scott, *supra*, at 45–46, are included, as are theft crimes, crimes of dishonesty, fraud and deceit, commercialized vice crimes, bigamy, and rape. See generally Note, *Crimes Involving Moral Turpitude*, 43 Harv. L. Rev. 117 (1929). I have difficulty putting possession of cocaine in the same category as these other crimes or labeling it "immoral in its nature."

Society's attitudes toward drugs and drug use are, at best, equivocal. Our lives are filled with a plethora of wonder drugs. Many, such as tranquilizers and stimulants, are mind-altering, and yet they are used by millions of Americans every day. Alcohol and tobacco, though highly addictive and physically debilitating, are tolerated despite their huge social costs. They support multi-billion-dollar industries, and acceptance of their use is deeply ingrained in our collective life style. Street drugs—marijuana and cocaine—may be black sheep, but they are members of the same family.

Recognizing cocaine's potential to harm both the user, and indirectly, others, society may take all reasonable steps to eliminate its use, including making it illegal. But, identifying drug abuse as a social problem does not render possession of cocaine immoral, any more than alcoholism renders any and all drinking immoral.

I do not agree with the majority that more than possession is at issue here. Appellant attempted to purchase approximately six grams of cocaine. He collected half the money for the buy from his colleague and intended to share the drug with him. This transaction did not involve trafficking: appellant had no profit motive. Moreover, appellant should not indirectly be held responsible for the actions of his associate nor should the associate be seen as a victim. There is no evidence that the associate was anything other than a willing participant in the drug transaction. He is also a lawyer, capable of knowing the consequences of his actions and deciding for himself whether to become involved. The key indicia of moral turpitude—dishonesty, injurious consequences, personal gain—are absent. See *In re Chase*, 299 Or. 391, 403, 702 P.2d 1082, 1089–90 (1985) (distinguishing between sale and trafficking offenses, which involve moral turpitude, and possessory offenses, which do not).