# Paul E. Howard, DVM, MS v. Wayne Usiak
# d/b/a Wayne Usiak & Associates

[775 A.2d 909]

No. 99-082

Present: Amestoy, C.J., Dooley, Morse and Skoglund, JJ., and Gibson, J. (Ret.),
Specially Assigned

Opinion Filed May 11, 2001

*John J. Collins* and *Michael J. Harris* of Sutherland, *Collins, McMahon & Harris, Inc.*, Burlington, for Plaintiff-Appellant.

*Thomas F. Heilmann* of *Heilmann, Ekman & Associates*, Burlington, for Defendant-Appellee.

**Dooley, J.** Client Dr. Paul Howard appeals from a judgment in favor of architect Wayne Usiak d/b/a Wayne Usiak & Associates in this architectural malpractice case. On appeal, client argues that the trial court erred in concluding that he did not prove negligence, nor negligent misrepresentation, and that he is not entitled to restitution of design fees or other damages based on violation of the architectural licensing statute. We affirm.

There is little dispute about the basic facts. Client is a veterinary surgeon who had plans to create an animal emergency clinic in Vermont to provide emergency care to pets after regular business hours and to offer services of visiting specialists, such as veterinary ophthalmologists. Architect is a specialized veterinary architect, who operates a licensed practice in New Mexico and has experience in designing clinics that conform to federal standards. In 1993, client attended a conference in Missouri at which veterinary architects, including architect, were promoting their specialized clinic structures. Client arranged a meeting with architect.

In December 1993, architect visited Vermont to meet with client and discuss rough ideas for the clinic. During architect's trip, he produced preliminary sketches of what he and client discussed. The parties decided to contract for architectural services. Before entering into a written agreement in later January, architect obtained a Vermont license to practice architecture through a reciprocal state licensing procedure.

A full contract with architect has three phases, described as: Phase I, Programming and Preliminary Design; Phase II, Construction Documents; and Phase III, Construction Administration. The parties contracted only for Phase I services. Architect described Phase I, in part, as follows:

> This portion . . . will provide you with a set of drawings sufficient to approach lending institutions, governmental agencies, review committees and the like. These will be detailed enough to develop accurate budgets, approach potential contractors, gain preliminary agency approvals . . . . On the other hand, they will also be flexible enough to make any changes necessary for budgetary, building code or personal changes of mind you may have after reviewing a hard copy.

Architect charged ten percent of construction costs as a fee for all three phases. Of this, 35% was attributed to Phase I. The contract

specified that construction costs were estimated at $280,000 so that architect's fee would be $28,000 for all phases, and, specifically, $9,800 for Phase I.

Client and architect then worked together to design a structure that would be within client's budget. They envisioned a clinic with approximately 2,900 square feet that would be primarily housed on the first floor with a second floor containing a small sleeping quarters, a meeting room, and office space for client. The second floor would be used by clinic workers only and would be accessed by stairs. Architect drafted plans based on these specifications.

Soon after client initiated the process to obtain the necessary permits for the building, the issue arose as to whether the structure required an elevator under state regulations. Architect expressed his belief to client that federal law exempts buildings under 3,000 square feet from elevator requirements for handicap accessibility. The court found that the general rule is that public buildings are required to be accessible to persons with physical disabilities, which includes having elevators for multistory buildings, but both parties believed that client could circumvent any elevator requirement due to the limited purpose of the clinic's second floor. An experienced local builder affirmed architect's belief by telling client that he would not need to include an elevator in the structure. Client then continued the permitting process with limited professional assistance from a permitting consultant.

The permitting process made evident that the structure, as designed for the contemplated uses of the second floor, would need an elevator. Vermont regulations on accessibility for persons with physical disabilities are more stringent than federal regulations. Architect proposed three alternatives to installing an elevator; however, all three solutions increased the costs of the building in excess of client's budget. In 1995, client applied to the Vermont Architectural Barrier Compliance Board for an exemption from the elevator requirement, and the Board granted an exemption upon the condition that the second story be used only for an office and two storage rooms. Throughout this process, architect remained willing to revise the design of the building so that it satisfied client's needs and complied with state and federal laws. Client, however, fired architect without affording him the opportunity to redraft the clinic design. By the time that client fired architect, architect had submitted bills for all Phase I services, indicating that he had performed all services due under this preliminary phase.

Client then filed suit against architect alleging that he was entitled to recover money paid to architect for his services and lost future profits from the delays occurring as a result of the elevator issue. Client's complaint stated four causes of action: violation of the Vermont architectural licensing statute, negligence, negligent misrepresentation, and misrepresentation. Client appeals from the court's dismissal of all claims, except he has not appealed the dismissal of the misrepresentation claim. His three claims on appeal are that the trial court erred in not finding as a matter of law that: (1) architect negligently misrepresented his qualifications and intentions; (2) client was entitled to a return of the fee paid architect because architect commenced services before obtaining a Vermont license; and (3) architect committed malpractice in not finding and notifying client of the elevator requirement, and in designing a building that did not comply with an applicable code.

Client argues first that the trial court erred in finding that architect did not engage in negligent misrepresentation regarding his qualifications, knowledge and job performance in entering into the contract with client. He contends that the following representations made by architect meet this definition. First, architect represented that he was a veterinary specialist with considerable specialized expertise in the design of veterinary facilities, including handicapped accessibility. Second, architect represented that because he was a specialist designer, he understood the impact that design decisions have on costs, staffing, and methods of practice. Third, to assuage client's reservations about employing an out-of-state architect, architect assured client that building codes and materials were available to ensure that client's building complied with applicable codes. Client contends that because he justifiably relied on these representations in hiring architect, and incurred increased costs attributable to architect not knowing or discovering the elevator requirement prior to designing the clinic, architect is liable for his pecuniary loss.

■ Vermont has adopted the definition of negligent misrepresentation from the Restatement (Second) of Torts:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise

reasonable care or competence in obtaining or communicating the information.

*Limoge v. People's Trust Co.*, 168 Vt. 265, 268-69, 719 A.2d 888, 890 (1998) (quoting Restatement (Second) of Torts § 552(1) (1977)). What is reasonable care or competence depends on the circumstances, and will vary depending on many factors; the question is, therefore, generally for the factfinder. *Id.* at 270, 719 A.2d at 891.

Client relies primarily on *Limoge*, in which we reversed a superior court order granting summary judgment to the defendant on a negligent misrepresentation claim and remanded for a trial on the merits because the factfinder could have found negligent misrepresentation on the facts presented. *Id.* at 269, 271, 719 A.2d at 890, 892. Unlike *Limoge*, here, the court has held a trial on the merits, and the factfinder found that architect did not fail "to exercise reasonable care or competence in . . . communicating the information" client claims to be false. Because this conclusion is supported by the findings and the evidence, we must uphold it. See *Begins v. Begins*, 168 Vt. 298, 301, 721 A.2d 469, 471 (1998).

There is also a more fundamental problem with client's negligent misrepresentation theory. Client claims architect was negligent either because he "misstated his knowledge and background in[] applicable building codes" or because he misstated "his willingness to sufficiently research applicable building codes in performing his work." The only evidence client has to arguably support the former theory is that architect did not find the elevator requirement. We do not believe that the evidence supports the theory. The evidence showed that architect was a specialist in designing veterinary facilities; that he had extensive experience in dealing with national building codes and was often employed by clients in other states; that he understood the effect design has on cost, staffing, and methods of practice; and that building codes were available to him to ensure that any structure complied with applicable codes. Architect did not claim to know the applicable Vermont codes before he began providing services. His only claim was that the requirements of the codes were ascertainable, even from New Mexico, and that he could and would ascertain them. In the light of this evidence, the fact he did not find the elevator requirement shows nothing about the state of architect's "knowledge and background in[] applicable building codes" when he made the representation.

Client's second theory turns a promise to perform into a statement of fact so that failure to perform automatically shows a

misrepresentation of intention to perform. As a result, any breach of contract would be misrepresentation so that negligent breach would be a tort. See *Gerhardt v. Harris*, 934 P.2d 976, 985 (Kan. 1997) (rejecting notion that any breach of contract claim could be treated as including negligent misrepresentation claim as overly expansive reading of Restatement (Second) of Torts § 552). We have emphasized in prior cases the need to keep tort and contract theories separate so that negligence concepts do not overrun the limitations on contractual rights and remedies. See *Breslauer v. Fayston Sch. Dist.*, 163 Vt. 416, 421-22, 659 A.2d 1129, 1133 (1995). We do so here by holding that "information" for purposes of the elements of negligent misrepresentation does not normally include the intention to perform a contractual commitment. See *Murray v. Xerox Corp.*, 811 F.2d 118, 123 (2d Cir. 1987) (applying New York law); *McAlister v. Citibank*, 829 P.2d 1253, 1261 (Ariz. Ct. App. 1992) (under Restatement § 552); *High Country Movin', Inc. v. U.S. West Direct Co.*, 839 P.2d 469, 471 (Colo. Ct. App. 1992) (under Restatement § 552); *Bank of Shaw v. Posey*, 573 So. 2d 1355, 1360 (Miss. 1990).[1]

Client next contends that he should recover sums paid to architect because architect was not licensed at the time the contract was signed or when architect performed services, as is required by statute. See 26 V.S.A. § 122(a)(1) (prohibiting unlicensed persons from practicing architecture in Vermont). Architect obtained his license to practice architecture in Vermont on January 19, 1994. The parties dispute the date that they entered into a written contract, client claiming that it was in December 1993, the date on the contract, and architect claiming

---

[1] For purposes of fraud, the Restatement (Second) of Torts § 530(1) provides "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." Courts have split on whether this doctrine applies to negligent misrepresentation claims. Compare *Gerhardt*, 934 P.2d at 986 (§ 530(1) does not apply to negligent misrepresentation claims) and *City of Warrensburg v. RCA Corp.*, 571 F. Supp. 743, 753 (W.D. Mo. 1983) (same), with *Grahek v. Voluntary Hosp. Coop. Ass'n*, 473 N.W.2d 31, 35 (Iowa 1991) (applying fraud standard — "statement of an intent to perform a future act is actionable in fraud if the statement is made with existing real intention not to perform" — to negligent misrepresentation claim). We need not resolve this question. Even if plaintiff could base a negligent misrepresentation claim on a showing that defendant had no intention of fulfilling a promise to perform, he cannot establish defendant's intent solely by proof of nonperformance of the promise. Restatement (Second) of Torts § 530(1), cmt. d. In this case, the only evidence plaintiff has offered of defendant's intent at the time of making the representation is his failure to discover the elevator requirement. This evidence is inadequate, even assuming we accept that plaintiff can show the tort based on defendant's intent not to perform his promise to determine the applicable regulatory law.

it was not until client returned the signed contract in April 1994. The court found that the parties executed the written contract in late January 1994, after architect was licensed. Client argues, however, that the date the contract was signed is not determinative, as architect negotiated the contract, accepted a $2,000 retainer, visited Vermont to consult with client and completed schematic drawings of the final design all by mid-January before obtaining the license. Client contends that these facts show that architect was practicing architecture prior to obtaining a license.

Client relies on *Markus & Nocka v. Julian Goodrich Architects, Inc.*, 127 Vt. 404, 250 A.2d 739 (1969), in which we held that architectural contracts entered into in violation of the registration statutes are illegal and unenforceable. Thus, we reversed a trial court decision assessing architect fees against the defendant, the principal architect on a hospital project in Burlington, Vermont, because no member of the plaintiff Massachusetts architectural firm, which the defendant had hired as consulting architect for the project, was registered under the architect-licensing statute. Client contends that under *Markus* he is entitled to return of the fees that architect collected under an unenforceable contract.

There are a number of possible grounds to distinguish *Markus*. In that case, the Massachusetts architects never became licensed in Vermont. Here, architect pursued a Vermont license before there was a contract between the parties and received the license before the written contract was signed and before the bulk of the services were delivered. In *Markus*, the architectural firm was suing for its fee; here the client is suing for return of the fee paid to the architect.

We distinguish *Markus* based on the latter difference. In *Gallagher v. Leary*, 164 Vt. 633, 674 A.2d 787 (1996) (mem.), we decided that failure of the architect to obtain a license could not be grounds for a suit for return of the architect's fee. In reaching that decision, we noted that "the licensing statute itself does not authorize recovery of fees." *Id.* at 633, 674 A.2d at 788. Subsection 122(b) of the licensing statute provides that a person who violates the statute is "guilty of a misdemeanor and shall be fined not more than $5,000.00," but the statute does not specify other penalties, nor recovery of design fees from violators. *Id.* at 633-34, 674 A.2d at 788. Moreover, recovery of payments is not necessary to effectuate the policy of the licensing statutes; thus, we saw "no reason to read into the statute an additional penalty not established by the Legislature." *Id.* at 634, 674 A.2d at 788.

Here, the trial court concluded that *Gallagher* prevented client from recovering back the fee paid to architect.

.Client urges us to distinguish *Gallagher* because in that case the clients actually used the revised plans the architect had prepared, and we noted that "requiring a party who provides services to return the fees received would provide an unfair windfall to the complaining party." *Id.* According to client, the unjust enrichment concern present in *Gallagher* is not present here because the plans that architect provided here were unusable because they failed to comply with the elevator requirement. Architect disputes this characterization, but we need not resolve this issue. Although unjust enrichment is a rationale for the *Gallagher* holding, the absence of customer satisfaction in a particular case does not change the rule. As in *Gallagher*, "[p]laintiff[] [has] received the services for which [he] paid. Returning the design fee would be inequitable under the circumstances." *Id.*

Finally, client argues that the trial court erred by concluding that architect was not negligent despite designing a two-story veterinary clinic without an elevator, and despite failing to inform client of the elevator requirement. In making this argument, client does not attack the findings as unsupported by the evidence or attack the conclusions as unsupported by the findings. Instead, he argues that the trial court should have granted the trial-by-court equivalent of judgment as a matter of law. Cf. V.R.C.P. 50(a)(1) (court may grant judgment as matter of law during jury trial where party has been fully heard on issue and there is no legally sufficient basis for reasonable jury to find for that party on that issue).

■ Generally, to prove architect malpractice in the design of a structure, the client must show that the architect negligently breached a duty to the client and, as a proximate result of the breach, the client suffered injury. See *So. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc.*, 138 Vt. 33, 41, 410 A.2d 1359, 1362 (1980). The leading case describing the negligence standard is *Coombs v. Beede*, 36 A. 104 (Me. 1896):

> The undertaking of an architect implies that he possesses skill and ability, including taste, sufficient to enable him to perform the required services at least ordinarily and reasonably well; and that he will exercise and apply, in the given case, his skill and ability, his judgment and taste, reasonably and without neglect. But the undertaking does not imply or warrant a satisfactory result.

*Id.* at 105; see also *Chaney Bldg. Co. v. City of Tucson*, 716 P.2d 28, 31 (Ariz. 1986) (architect "must use . . . skill, care and diligence to provide sufficient and adequate plans," but "work can be inaccurate or imperfect without being an actionable deviation from . . . standards of care"); *Smith v. Goff*, 325 P.2d 1061, 1064 (Okla. 1958) (architect required to exercise "ordinary professional skill and diligence" not to "guarantee perfect plans or satisfactory results").

The duty against which the *Coombs* negligence standard is applied generally arises from the contractual responsibilities the architect assumed. See Note, *Architectural Malpractice: A Contract-Based Approach*, 92 Harv. L. Rev. 1075, 1089 (1979). However, irrespective of the contractual language, courts have held that the architect's duty includes a requirement that a building designed will comply with all federal, state and local building codes in effect at the time. See, e.g., *Greenhaven Corp. v. Hutchcraft & Assocs.*, 463 N.E.2d 283, 285 (Ind. Ct. App. 1984) (implied in every contract between architect and employer is agreement that plans will comply with building codes); *Bott v. Moser*, 7 S.E.2d 217, 218 (Va. 1940) (architect is bound to know the building restrictions of designated place, and to draw plans and specifications accordingly); *Bebb v. Jordan*, 189 P. 553, 555 (Wash. 1920) (all contracts for architectural services have implied condition that work will be suitable for the purposes intended and presumes that architect knows restrictions imposed by law of place where building is to be erected); see also *Graulich v. Frederic H. Berlowe & Assocs.*, 338 So. 2d 1109, 1110-11 (Fla. Dist. Ct. App. 1976) (relying on *Bott* and affirming trial court findings based on expert testimony that it is incumbent upon architect to check with governmental authority as to regulations before preparing preliminary plans).

Thus, client has a simple theory of liability in this case — that architect negligently breached the duty to know and comply with the applicable building codes, and that the breach caused client damage. In support of this theory, client offered the testimony of a Vermont architect who stated that defendant-architect breached the applicable duty of care on this theory.

Nevertheless, the evidence presented a number of reasons why the simple theory should not prevail. First, architect's staff called the Vermont Department of Labor and Industry, the agency responsible for state building codes, see 21 V.S.A. § 252(a), and sought all applicable codes. The staff person was not told of the special rules on handicapped accessibility promulgated under 21 V.S.A. § 273(g) and in effect at that time, referred to at trial as the Green Book. See

Department of Labor and Industry, Vermont Access Board, Accessibility in Public Buildings: Rules for New Construction and for Alterations to Existing Buildings, 4 Code of Vermont Rules 24 100 002-1 through 111 (amended in 1997 and 1998).[2] Architect testified that this inquiry was made within two months of beginning work on the project. Thus, the court could find that the failure to know the elevator requirement was not negligent under the circumstances.

Second, and related, the rules relied upon by client contain no explicit elevator requirement for the building involved.[3] Apparently, the department was routinely requiring an elevator for buildings of this size despite lack of explicit support in its regulations. Thus, client's theory of duty would require the architect to seek out unwritten regulatory requirements through conversations with government regulators. Client's expert witness testified to that theory of the architect's duty, but the court could conclude it was not a minimum standard on which to find liability. Even this theory was of debatable application because, once the elevator requirement was discovered, architect discussed it with department staff and developed a strategy to get around it. The strategy was never employed, in part, because client employed a permit consultant and sought a variance.[4]

Third, the parties were in the first phase of a contract, and that phase necessarily included determining regulatory requirements and

[2] The court never explicitly found that architect contacted the department through his staff. It did find: "Although Vermont basically follows the national codes and regulations, it has published its own special book on handicap accessibility, which architect was never given. Vermont is unusually strict in requiring such accessibility." We construe findings in support of the conclusions and judgment. *Brattleboro Child Dev., Inc. v. Town of Brattleboro*, 138 Vt. 402, 406, 416 A.2d 152, 155 (1980), *overruled on other grounds by Am. Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103, 557 A.2d 900 (1989). The court's finding that architect was not given the accessibility regulations must refer to architect's testimony that his staff requested all codes from the department but did not receive the accessibility requirements.

[3] The superior court found that an elevator was required for client's building by 21 V.S.A. § 274(b). This statute contains an elevator requirement: "All other multistory buildings shall be provided with vertical access unless the building is exempted from this requirement pursuant to a rule of the access board." However, the relevant language was added to the statute in 1996, more than two years after the parties began working on a two-story design for the clinic. See 1995, No. 187 (Adj. Sess.), § 5.

[4] Client's expert witness testified that architect was negligent in not discussing his strategy for avoiding the elevator requirement with client. The court rejected this theory, and client has not raised it here. In any event, the court could find client effectively took over dealing with the elevator requirement by hiring the regulatory consultant and pursuing the variance.

adapting to them. See generally M. Wright & D. Boelzner, *Quantifying Liability Under the Architect's Standard of Care*, 29 U. Rich. L. Rev. 1471, 1473 (1995) (describing the usual four phases of an architect's contract; first phase includes "research of the site and of applicable government requirements"). Thus, the superior court explained: "Nothing in the AIA contract or the law in general requires an architect to draw up a building which will be permitted on the first draft." The court concluded that architect's duty was to "overcome impediments by redrafting," and he did so here.

Other facts supported this theory. In initial discussions between client and architect, client wanted a larger building than the limited budget could afford. To solve the budget problem, architect suggested attempting to capture second story space that would have otherwise been lost in an attic. The proposal was to use this space for nonpublic functions — client's office, a meeting room, a sleeping space and storage. The discovery of the elevator requirement resurrected the basic conflict between client's desires and his budget. Although he had considered the first phase of the contract completed, architect offered, without further charge, to prepare new designs that would eliminate spaces the client wanted, or reduce their size, or alternatively, would increase the size of the building and its cost. By that time, however, client began to blame architect for his difficulties and fired him.

The trial court particularly emphasized the willingness of the architect to create new designs without charge as fully complying with his contractual duty, if not exceeding it, and we agree. Compare *Bebb*, 189 P. at 556 (reversing trial court and entering judgment for architect on plans that client alleged failed to comply with city ordinances because plans were incomplete when client stopped work on them, and "he cannot now be heard to say that when completed they would have violated the contract as to cost, or the city ordinances, or would have otherwise been defective") with *Bott*, 7 S.E.2d at 218 (reversing judgment for architectural fees because plans prepared did not comply with setback restrictions in ordinance, and architect "did not at any time offer to change his plans or to redraft them to accomplish the purpose for which they were drawn."). Client urges us to discount this fact because architect submitted a bill that stated he had completed Phase I services by a design that had no elevator, and because architect's alternative plans increased the cost of the building, and, as a result, his fee. We find neither of these arguments determinative. Architect initially believed that he had fulfilled his Phase I commitments, but when he understood the elevator issue, and client's

response to it, he readily accepted his obligation to produce a complying design. The fact that a complying design might increase the cost of the building, and architect's fee, reflects the basic conflict between client's available funds and the size and functionality of the building to be built with those funds, not an attempt by the architect to get around limits on his fees.

The court could conclude on these facts that client's difficulties were caused by his own budgetary limitations, and architect was being creative, not negligent, in exploring the use of attic space to meet client's needs. Even after the elevator requirement was discovered, obtaining a variance, or finding a way around it, were still the best options for client to have a fully usable building within his budget.

Finally, the trial court relied upon the fact that client employed a permit consultant and sought a variance from the elevator requirement from the Vermont Architectural Barrier Compliance Board (now Access Board, see 21 V.S.A. § 272(a)). Client obtained the variance he applied for, but it allowed him to use the second floor only for an office and storage. Client complained that the use restriction was too limiting, but he had not sought a broader variance.[5]

■ We conclude that client has not shown that architect was negligent as a matter of law, and that the superior court's conclusion that architect was not negligent is supported by its findings and the evidence as a whole.

*Affirmed.*

.

---

[5] Client argues that the variance was inadequate, in part, because it specified that it was granted "only for the period the building is used as described in your application." Since client argued, in part, that the elevator was unnecessary because the second story space would not be used by the public, we fail to see how a variance could be granted without such a requirement.