NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 11

No. 2017-014

| | |
|---|---|
| In re Gregory J. Bombardier | Supreme Court |
| | On Appeal from Office of Professional Regulation |
| | September Term, 2017 |

Stephen A. Reynes, Appellate Officer

William L. Gagnon of Heilmann, Ekman, Cooley & Gagnon, Inc., Burlington, for Appellant.

Elizabeth A. St. James, Office of Professional Regulation, Montpelier, for Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **EATON, J.** Respondent is a professional engineer licensed by the State of Vermont. He challenges the Board of Professional Engineering's decision, affirmed by an administrative officer from the Office of Professional Regulation (OPR), that he engaged in unprofessional conduct. We affirm.

¶ 2. In August 2015, OPR provided respondent with a Specification of Charges. It included a statement of facts concerning respondent's investigation of an insurance claim, detailed below. It faulted respondent for the inspection itself as well as his failure to review or reconsider his opinion after being provided with contrary opinions from a contractor and another engineer. OPR alleged, among other things, that respondent committed unprofessional conduct in violation of 3 V.S.A. § 129a(b)(1) and (2) because, on a single occasion, he failed to conform to the essential standards of acceptable and prevailing practice.

¶ 3.     Following a contested hearing, the Board made the following findings. In 2014, respondent was hired by an insurance adjuster on behalf of an insurance company to investigate a claim filed by Rand Larson against Atlas Plumbing & Heating, LLC. Mr. Larson alleged that Atlas had notched a support beam while installing radiant heating in his home, causing his floor to buckle. The notch, which was approximately 2.5 inches deep and 5.5 inches wide, was located at the top of a double two-by-twelve-inch beam that ran under the proposed kitchen area of Mr. Larson's home. Respondent was asked to provide his opinion on the cause of the floor buckling. Respondent conducted his investigation solely for Atlas's insurance carrier. Mr. Larson did not hire respondent and had no contractual relationship with him.

¶ 4.     Mr. Larson had the flooring work done as part of a broader home renovation project. As part of this project, Mr. Larson also had a building contractor install a skirt on the north side of the house to conceal the foundation and cantilevered construction. Concrete sonotubes were installed to attach and support the skirt. The sonotubes were not intended to support the house itself, which had cantilevered over the concrete foundation walls since 1993. After Mr. Larson discovered the notched beam, he also had the contractor perform remedial work intended to shore up the north wall of the house from the exterior, including jacking and installing additional vertical supports beneath the north wall.

¶ 5.     Respondent inspected Mr. Larson's home on June 20, 2014. At that time, the remedial shoring work was in progress. Mr. Larson was not present, but his contractor was. The skirting had been removed from a portion of the north wall; excavation was in progress; two sonotubes could be seen under the rim joist; a third sonotube lay nearby on the ground; and a bottle jack was visible beneath a wood beam and adjacent to what appeared to be a new wood post. The sonotube at the east end of the exposed area was shimmed to the underside of the rim joist, and appeared new compared to the weathered surface of the other two sonotubes.

¶ 6.     Respondent also observed sandbags placed near the southeast corner of the house, which he inferred were to divert stormwater. He saw that a sonotube placed in the general area of

the settlement was out of plumb. Respondent assumed that the sonotubes were "foundational elements" that had been installed to support the rimboard under the north wall.

¶ 7.    Respondent then viewed the notched beam from above through a hole that had been cut in the flooring.* He observed that there was no cracking or splintering of the beam in the notch area. He was unable to see the notched beam from below. Respondent concluded that the floor settlement was not caused by the notched beam, but rather by settlement of the exterior sonotube due to excessive stormwater runoff and the excessive freeze and thaw cycles of Vermont winters.

¶ 8.    Following respondent's inspection, Mr. Larson hired another engineer, James Baker, to investigate the cause of the floor settlement. Mr. Baker believed that the notched beam caused the floor to settle. After receiving Mr. Baker's report, Mr. Larson contacted respondent seeking a reinspection; respondent did not respond. The insurance company provided respondent with a copy of the Baker report, asking whether there was anything in it that would cause respondent to reinspect the property or question his own opinion. Respondent saw nothing in the Baker report that caused him to question his own opinion. In August 2014, the insurer denied Mr. Larson's claim. Mr. Larson subsequently sent an email to respondent, threatening to sue him and to file a professional complaint against him if he "continue[d] to fail to consider the irrefutable proof that we hold that totally refutes your conclusions!" Mr. Larson then filed a professional complaint against respondent.

¶ 9.    As noted above, OPR alleged that respondent committed unprofessional conduct by conducting a deficient investigation and by refusing to reconsider his conclusion after being provided with evidence "that his findings were incorrect" from a contractor and engineer hired by Mr. Larson. In its Specification of Charges, OPR asserted that "[a]fter receiving multiple conclusions and opinions from other knowledgeable tradesmen or other professional engineers

_____

* The exact location of the notched beam, and thus its purpose, were not established during the hearing.

3

that are contrary to one's own, the essential standards of acceptable and prevailing practice require a professional engineer to review or reconsider the professional opinion he or she rendered in light of the contrary opinions."

¶ 10. The Board did not find that respondent committed unprofessional conduct by failing to review or reconsider his opinion. It agreed with respondent that there was no new information in the Baker report that would cause respondent to question his own opinion. It noted that respondent was not asked by his client, the insurance company, to reinspect the premises.

¶ 11. The Board did discipline respondent, however, based on the investigation that he undertook to determine the cause of the floor buckling at the Larson home. Had respondent undertaken only to rule out the work done by Atlas Heating and Plumbing as the cause of the damage, this would be a different case. Respondent agreed to a much broader undertaking, however, than ruling out a specific cause.

¶ 12. The Board concluded that on the single occasion of June 20, 2014—the date of the home inspection—respondent failed to conform to the essential standards of acceptable and prevailing practice. It found respondent's inspection of the house deficient in numerous respects, including that: respondent failed to ask Mr. Larson about the house's history; he failed to ask the on-site contractor about the prior renovations and ongoing remedial work; he had limited observations of the framing; he drafted a minimally noted framing plan; he assumed that the notched beam and north wall were supported by the sonotubes (and not cantilevered construction) without verifying this through measurement or direct observation; he failed to fully inspect the entire beam before concluding that the notched beam was sound; he failed to discover that the house had been built to cantilever over the foundation wall and that the sonotubes were a more recent addition and not intended to support the weight of the house; he failed to ask for assistance in gaining improved access or recommending this to his client; he failed to perform any load or strength calculations on the notched beam; and he submitted a report concluding that the notched beam was not the cause of the settlement problem.

4

¶ 13.   Based on these and other findings, the Board concluded that on June 20, 2014, respondent failed to conform to the essential standards of acceptable and prevailing practice by: failing to conduct even a basic level of information gathering on the past history of the building, which can often be relevant when investigating structural problems; doing a poor job of documenting the layout and support conditions at the first floor framing in the area in question; failing to perform a sufficiently detailed evaluation of the notched beam to rule out the notch as the cause of the problem; failing to adequately consider other possible causes of the reported settlements; and failing to identify or to address the limited access he had to conduct a sufficiently thorough investigation of the causes of the settlement.   The Board ordered that respondent be reprimanded and it imposed an administrative penalty of $1000.

¶ 14.   Respondent appealed from this decision to OPR and the case was assigned to an administrative officer (AO).   Respondent argued to the AO that: (1) the Specification of Charges was fundamentally flawed and contrary to Vermont public policy; (2) the Board violated his right to due process; and (3) the Board misconstrued the scope of his undertaking.   See 3 V.S.A. § 130a(b)(1)-(7) (identifying grounds that party may raise on appeal to AO).   After conducting an on-the-record review, the AO affirmed the Board's decision.   We discuss the AO's rationale below. This appeal followed.

¶ 15.   Like the AO, "[w]e will affirm the Board's findings as long as they are supported by substantial evidence, and its conclusions if rationally derived from the findings and based on a correct interpretation of the law."   Braun v. Bd. of Dental Exam'rs, 167 Vt. 110, 114, 702 A.2d 124, 126 (1997); see also Devers-Scott v. Office of Prof'l Regulation, 2007 VT 4, ¶ 4, 181 Vt. 248, 918 A.2d 230 ("Where there is an intermediate level of appeal from an administrative body, we review the case under the same standard as applied in the intermediate appeal." (quotation omitted)).   "Additional deference is owed here because the action arose out of an administrative proceeding in which a professional's conduct was evaluated by a group of his peers."   Id.

5

¶ 16.   Respondent raises the same arguments on appeal that he raised to the AO. We reject respondent's arguments on grounds similar to those identified by the AO.

¶ 17.   We begin with respondent's complaint about the context in which the claim against him arose. As he did below, respondent notes that his client was an insurance company, not Mr. Larson, and that his client had no issues with his services or the conclusions in his report. He asserts that Mr. Larson filed a complaint against him because he wanted money from the insurance company. Respondent maintains that no charges were warranted because the disciplinary rules serve to protect the public rather than to vindicate private rights and his behavior posed no threat or danger to the public.

¶ 18.   We emphasize at the outset that while Mr. Larson may have filed a complaint against respondent, OPR conducted its own investigation and exercised its own discretion in deciding whether to pursue charges against respondent. It is true, of course, that the purpose of regulating certain professions or occupations, including professional engineers, is to protect the public. See 26 V.S.A. § 3101(a) ("It is the policy of the state of Vermont that regulation be imposed upon a profession or occupation solely for the purpose of protecting the public."). To this end, the Legislature has adopted specific laws that define "unprofessional conduct" for license holders in specified occupations and professions and has provided that these license holders can be disciplined for such conduct. See 3 V.S.A. § 129a (identifying specific conduct by licensee that constitutes unprofessional conduct); 26 V.S.A. § 3181(a)-(b) (providing that "[i]t shall be unprofessional conduct for a licensee . . . to engage in conduct prohibited by this section, or by 3 V.S.A. § 129a," and defining "unprofessional conduct"). The term "unprofessional conduct" as defined for these particular occupations and professions includes "[f]ailure to practice competently by reason of any cause on a single occasion . . . whether actual injury to a client . . . or customer has occurred." 3 V.S.A. § 129a(b). "Failure to practice competently includes: . . . failure to conform to the essential standards of acceptable and prevailing practice." Id. § 129a(b)(2). One

6

does not need to be a client, or to suffer actual harm, in order to file a complaint against a license holder. See id. § 129(b).

¶ 19. Respondent takes an overly narrow view of what protection of the public means. Enforcement of the laws governing unprofessional conduct protects the public. As the prosecutor, OPR has broad discretion in deciding "whether to prosecute in any given case and what charge to file." Shaddy v. State Office of Prof'l Regulation, 2014 VT 111, ¶ 8, 197 Vt. 625, 112 A.3d 718 (quotation omitted). If OPR decides to file charges, it is then up to the Board, as factfinder, to determine if unprofessional conduct has occurred. In this case, OPR did not file a complaint because of any relationship that existed between Mr. Larson and respondent; there was none. Mr. Larson's satisfaction, or lack thereof, with anything done by respondent at the premises is irrelevant to whether respondent engaged in unprofessional conduct.

¶ 20. The question of whether a professional engineer has engaged in unprofessional conduct does not turn on whether a client is upset or has filed a complaint. The license holder and the client may properly limit the scope of the work to be undertaken; nothing in this decision should be construed to the contrary. Further, the scope of the undertaking impacts the applicable professional standards. At the same time, the client may be quite happy with the results obtained. The fact that a professional engineer may properly limit the scope of his or her work and that a client is satisfied with that work are separate considerations from whether there has been compliance with applicable professional standards in performing the particular work that the professional engineer has agreed to undertake. Similarly, the fact that one might sue a professional engineer for damages in superior court does not obviate the engineer's independent duty to avoid unprofessional conduct nor does it deprive the Board of its statutory authority to address such conduct. See 3 V.S.A. § 129 (defining power of boards generally); 26 V.S.A. § 1172 (defining powers and duties of Board of Professional Engineering).

¶ 21. While we agree with respondent that the rules should not be used to settle private disputes, that is not what happened here. As set forth above, OPR decided in its discretion,

following an investigation, that charges were warranted. The Board then concluded after a hearing that respondent failed to conform to the essential standards of acceptable and prevailing practice for five different reasons, and each of these reasons was supported by multiple points based on specific facts found by the Board. These shortcomings were based upon respondent's failure to professionally perform the engineering work that he undertook in his relationship with the party who hired him. There is no evidence that the email sent to respondent by Mr. Larson influenced the Board's consideration of the professional conduct complaint brought by OPR. Respondent did not directly challenge any of the Board's findings, and these findings support the Board's conclusion.

¶ 22. Respondent's reliance on Tyson v. The Fla. Bar is misplaced. 826 So.2d 265 (Fla. 2002) (per curiam). In that case, the court recognized that a dissatisfied client has no right to demand that the state bar file disciplinary charges against a former attorney. Id. at 267-68. As that court explained, "[t]he role of the complaining witness in a bar disciplinary proceeding . . . is somewhat analogous to that of the victim in a criminal proceeding and, like crime victims, complaining witnesses cannot demand that the prosecuting attorney file criminal charges against a particular individual based on alleged criminal behavior." Id. at 267. Like the petitioner in that case, Mr. Larson had no right to force OPR to bring disciplinary charges against respondent, nor was Mr. Larson a party to these proceedings. See Vermont Administrative Rules of the Office of Professional Regulation, Rule 1.1(J) (defining "party" in "disciplinary hearing and appeal" as "licensee and the State of Vermont"), https://www.sec.state.vt.us/media/477012/OPR-Rules-for-Web-April-2014.htm [https://perma.cc/T4AU-9URQ]. He was, however, entitled by statute to file a complaint against respondent. See 3 V.S.A. § 129(b). It was then for OPR to determine in the first instance whether prosecution for unprofessional conduct, which inherently protects the public interest, was appropriate. We reject respondent's argument that the charges against him were fundamentally flawed or contrary to public policy.

8

¶ 23. Respondent next asserts that he was deprived of basic due process because the OPR's Specification of Charges did not allege that he failed to gather sufficient information during his investigation or that he failed to sufficiently document aspects of his investigation. Respondent maintains that he has been penalized for uncharged behavior. While he acknowledges that he introduced evidence on these points, he argues that had he been on notice of such charges, he would have put on additional evidence such as the nature of insurance investigations, the expectations of insurance companies, and how his services must reflect his client's needs and designs. He adds that he would have offered evidence that his insurance clients have been satisfied with his work, and he would have explained why he conducted his investigation the way that he did. According to respondent, the charges against him turned on whether he should have reconsidered his own opinion in the face of the Baker report and, once the Board rejected this claim, the case should have been over.

¶ 24. We find no error. As we have explained, "notice in an administrative proceeding need only be reasonable." In re Hot Spot, Inc., 149 Vt. 538, 540, 546 A.2d 799, 801 (1988) (citing 1 K. Davis, Administrative Law Treatise § 8.04, at 523 (1958)). The notice requirement for Vermont administrative proceedings is set forth in 3 V.S.A. § 809(b)(1)-(4), which requires that "[t]he notice shall include . . . a short and plain statement of the matters at issue." In re Hot Spot, Inc., 149 Vt. at 540, 546 A.2d at 801 (quoting 3 V.S.A. § 809(b)(4)). The Specification of Charges satisfied this requirement and provided respondent fair notice of the basis of OPR's charges against him. See In re Berk, 157 Vt. 524, 528, 602 A.2d 946, 948 (1991) (per curiam) (recognizing that "basic procedural due process rights" include "right to fair notice of the charges"); see also 2 C. Koch, et al., Admin. Law & Practice § 5:32 (3d ed.) ("It has long been established that due process requires notice reasonably calculated, under all circumstances, to inform the private party of the nature of the government action so as to allow an opportunity to challenge the action.").

¶ 25. First, the Statement of Facts contains specific allegations about respondent's conduct during the June 20, 2014 inspection, stating that: he had inspected the floor settlement

9

issue pursuant to an insurance claim; noted that the sonotube placed in the general area of the settlement was out of plumb; and concluded that the floor settlement was caused by settlement of the exterior sonotube due to excessive stormwater runoff and the excessive freeze and thaw cycles of Vermont winters. The Statement of Facts further provided that, despite specific and identified information provided or available to respondent, he nonetheless concluded that the notched beam was not the cause of the floor settlement issue. OPR alleged that "[t]he act(s), omission(s), and/or circumstance(s) described above constitute[d] grounds for discipline."

¶ 26. As reflected above, this is not a case where OPR merely alleged that respondent had violated a certain statutory section. Vt. Real Estate Comm'n v. Martin, 132 Vt. 309, 314, 318 A.2d 670, 674 (1974) (recognizing that "[n]otice of a statutory section without more is insufficient"). Instead, it provided respondent sufficient factual background to put him on notice that he was alleged to have committed unprofessional conduct during his June 20, 2014 inspection. See In re Desautels Real Estate, Inc., 142 Vt. 326, 333, 457 A.2d 1361, 1364 (1982) (recognizing sufficiency of notice issued by Vermont Real Estate Commission where notice quoted statute allegedly violated and contained "narrative report of the alleged facts upon which the Commission was basing its complaint"); see also In re Hot Spot, Inc., 149 Vt. at 540-41, 546 A.2d at 801 (finding notice sufficient where this standard was satisfied).

¶ 27. Additionally, as the AO pointed out, respondent was questioned extensively about his report during the Board hearing. He did not object to a Board member's characterization of his report as the "heart" of the matter nor did he object to the extended inquiry regarding his investigation and conclusion. He provided additional testimony about his inspection during the presentation of his case. Respondent's counsel devoted substantial time in his opening statement at the hearing to a detailed description of the investigation undertaken by respondent, including that he then "evaluated" what he learned after complete investigation. The complaint and the hearing were not confined to the question of whether respondent committed unprofessional conduct by failing to review or reconsider his conclusion in the face of contrary opinions. The

10

record shows that respondent was provided "an adequate opportunity to prepare and respond to the issues raised in the proceeding." In re Petition of Green Mountain Power Corp., 131 Vt. 284, 293, 305 A.2d 571, 577 (1973) (stating in administrative regulation context that "question on review is not the adequacy of the original notice or pleading but is the fairness of the whole procedure," and critical to determination of whether procedure was fair is whether parties "were given an adequate opportunity to prepare and respond to the issues raised in the proceeding") (citing 1 K. Davis, Administrative Law Treatise § 8.04, at 525 (1958)). We agree with the AO that respondent fails to show that the Board violated his due process rights or that "unlawful procedure" under 3 V.S.A. § 130a(b)(3) occurred.

¶ 28. Finally, respondent argues that the Board misconstrued the scope of his undertaking. He essentially asserts that the Board ascribed an overly broad interpretation of the scope of his engagement, contrary to his contract with the insurance company. He maintains that his client never asked him to inquire about the history of Mr. Larson's home, to prepare detailed documentation of the layout and support conditions, or to investigate other possible causes of the settlement beyond the notched beam. Thus, according to respondent, the Board should not have faulted him for failing to do so. He cites nondisciplinary cases in support of his position. See, e.g., Howard v. Usiak, 172 Vt. 227, 234-35, 775 A.2d 909, 915-16 (2001) (explaining that "[g]enerally, to prove architect malpractice in the design of a structure, the client must show that the architect negligently breached a duty to the client" and "duty against which the . . . negligence standard is applied generally arises from the contractual responsibilities the architect assumed"); S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, 138 Vt. 33, 42, 410 A.2d 1359, 1363 (1980) (stating that for purposes of plaintiff's negligent supervision claim, "duty owed by [architecture firm] to the plaintiff was set out in their contract"); see also Goette v. Press Bar & Cafe, Inc., 413 N.W.2d 854, 856 (Minn. Ct. App. 1987) ("The employment of an architect is a matter of contract, and the architect is responsible for the duties enumerated in the contract."). He

11

contends that the Board essentially imposed duties on him contrary to the wishes of his client and his agreement with that client.

¶ 29. We reject this argument. While the scope of a license holder's duty may depend on the terms of a contract, respondent here testified that he agreed to a very broad undertaking. At the hearing, he stated on at least five occasions that he was hired to render a professional opinion as to the "cause" of the damage to Mr. Larson's home, and the Board so found. Respondent did not provide any evidence to support his claim as to a limited scope of engagement with the insurance company. His argument on appeal is thus contrary to an unchallenged Board finding that was supported by respondent's own testimony. Having undertaken to investigate and determine the cause of the damage, respondent was required by his professional licensure to competently perform the services he agreed to render. The Board's findings support its conclusion that respondent did not meet the essential standards of acceptable and prevailing practice in carrying out the service that his client retained him to perform. We find no grounds to disturb the Board's decision.

Affirmed.

FOR THE COURT:

_____

Associate Justice